# Case No. 1,924.

## BRONDE et al. v. HAVEN.

### [Gilp. 592.] [1]

District Court, E. D. Pennsylvania. Jan. 15, 1836.

SEAMEN—WAGES—LIABILITY OF OWNER—SALE OF VESSEL — LOSS OF VESSEL ON HOMEWARD VOYAGE.

1. Seamen have a triple security for their wages, the vessel, the owner, and the master.

[Cited in The A. Heaton, 43 Fed. 595.]

2. The owner of a vessel, although his name is not stated in the shipping articles, is liable for the wages of a seaman.

[Cited in The Swallow, Case No. 13,665.]

3. The sale of a vessel by the owner, subsequent to the making of the shipping articles, does not discharge his liability for the wages of a seaman, even though the voyage was not terminated, or the wages were not demanded, previous to the sale.

[Cited in The Swallow, Case No. 13,665.]

4. Where a vessel which arrives at a foreign port, discharges her cargo, and remains there some time after the discharge, is lost on the homeward voyage, the seamen are entitled to their wages up to the time of the discharge, but not for half the time she afterwards remained in the foreign port.

[Disapproved in Pitman v. Hooper, Case No. 11,186. Cited in The Niphon's Crew, Id. 10,277.]

[See Giles v. The Cynthia, Case No. 5,424; The General Chamberlain, Id. 5,310; Hindman v. Shaw, Id. 6,514; Flanagan v. United States & B. M. S. S. Co., 30 Fed. 202.]

[1] [Reported by Henry D. Gilpin, Esq.]

[In admiralty. Libel in personam for seamen's wages, by John Bronde, James Dove, and William Moore, against Thomas A. Haven, owner of the brig Caroline. Decree for libellants.]

Grinnell, for libellants.
Haley, for respondent.

HOPKINSON, District Judge. The libel sets forth that the libellants, severally, on the 30th July, 1833, at the port of Philadelphia, at the request of Jacob A. Warnack, master of the American brig Caroline, of which Thomas A. Haven was then the owner, shipped as mariners to perform a voyage from the port of Philadelphia to the river La Plata and other places, for the term of twelve months, unless sooner discharged in a port of the United States, at the following monthly wages; John Bronde fourteen dollars, James Dove, and William Moore thirteen dollars each. The libellants further allege, that they proceeded on the said voyage from Philadelphia to the port of Monte Video, where the brig arrived on the 21st October, 1833; and, having there discharged a part of her outward cargo, sailed with the residue from Monte Video for Buenos Ayres, on the 21st December, and arrived there on the 24th of the same month. The brig, on the 24th May, 1834, after discharging at Buenos Ayres the said residue of her outward cargo, and having there taken in another cargo, sailed for Philadelphia. On the 2d June, 1834, the brig, pursuing her said voyage home, was wrecked in St. Sebastian's bay forty miles east of Rio Janeiro. The libellants continued on board the brig, from the time of their shipment until the said 2d June, faithfully performing their duty as mariners. They further aver that by their labour and exertions, with the rest of the crew, a great part of the cargo of the brig, more than sufficient to pay the wages of the crew, and a great part of her tackle, were saved and brought to shore. They allege that, allowing them for their services on board of the brig, from the time of their going on board to the time of the wreck, there is due to Bronde a balance of ninety-six dollars and eighty-two cents, to Moore ninety-three dollars and sixty-eight cents, to Dove one hundred and nine dollars and twenty-three cents. The libel prays for a decree for these sums to the libellants respectively, or a salvage equal in amount thereto.

The answer of Thomas A. Haven denies that he was a party to any contract with the libellants, for wages for the voyage in the libel mentioned, or that he is in any respect answerable or liable for any part of the said claims for wages or salvage, as owner of the said brig Caroline. That he is wholly ignorant of these pretended claims, and therefore denies the same. He then traverses all the facts alleged in the libel, and submits himself to the judgment of the court. On

these pleadings, the cause came on to a hearing, when the counsel for the libellants abandoned their claim for salvage, it appearing that all the articles saved from the wreck had been consumed in expenses. The case then rested on the claim for wages, as follows: From the time the men were shipped, to wit, the 30th July, 1833, to the arrival of the brig at Buenos Ayres, which was on 24th December, 1833, and half the time she lay there. She sailed from that port on the 24th May, 1834. Wages were therefore demanded from 30th July, 1833, to 20th March, 1834.

These dates and facts being agreed to, the respondent puts himself upon two grounds of defence. 1. That the brig, at the time she sailed from Philadelphia was owned by him, but that a short time after she sailed, she was transferred by him to John A. Haven, of New York, whereby the respondent was discharged from all liability for the wages of the crew, who are bound to look for them to John A. Haven, the owner of the vessel, to whom the whole freight and earnings were transferred with her; and that the law turns the seamen for their wages to the owner of the vessel when the demand is made, and not to those who at any previous time might have been her owners. 2. That if the respondent is liable, the wages ought to be calculated, not for half the time the brig lay at Buenos Ayres, but only up to the time when she discharged her cargo there and commenced taking in her homeward cargo; that it appears by the evidence that the outward cargo was finally discharged on the 4th January, 1834, and that, on the next day, they commenced taking in the return cargo.

1. On the first point, the bill of sale of the brig to John A. Haven is dated on the 14th March, 1834; nearly eight months after her departure from Philadelphia, and two months after the discharge of the outward cargo. If, therefore, the respondent is right in fixing that period for the termination of the contract for wages, they were actually earned and the services for them rendered, while he was the owner of the vessel. Nay, the claim insisted upon by the libellants also comes within the time, when the respondent continued to be owner of the brig. The respondent, however, contends, that when he transferred the brig, he also transferred and parted with all her freight and earnings, and thereby discharged himself from his contract with the mariners, and all the obligations dependent upon it, which fall upon the new owner, to whom the mariners must look for whatever they are entitled to. He says, that as no owner is named in the shipping articles, the seamen did not give credit to him or any particular individual, but that they relied upon the master and ship for their wages, and that the law further makes the owner, whosoever he may be, when the demand is made,

but not the antecedent owner, responsible for their claims. With whatever earnestness and ingenuity this doctrine has been supported by the learned counsel for the respondent, it is certainly novel and repugnant to the first principles of fair and equal dealing. If there be any thing settled in the law it is that seamen have a triple security for the payment of their wages, the ship, the owner, and the master. This is the security the law gives them, on a sound and just policy, and are we authorised to say, that because the name of the owner may not be set out as a party to the contract, therefore the mariner has consented to give up his liability and abandon the rights conferred on him by the law? Can we presume that he did not know who was the owner, and gave no credit to him? I think not. The owner is bound, not by any direct or express covenant or promise in the written contract, but by the decree of the law, named or not named, declared or concealed. The master makes the contract, as well for his owner as himself and the ship, and all are bound by it. It is not part of the written contract that the ship is answerable for the wages, but can it be thereupon argued that the ship was not looked to for their payment. It is the security of the law which accompanies the contract, and no presumption can be raised against it because it is not expressly declared. Indeed the shipping articles contain little more than a detail of the duties of the mariner; for his rights he is left to the protection of the law. It has been truly replied by the libellants' counsel that the owner of the vessel, although not named, does appear on the face of the contract as a party to it, for the forfeitures and damages, which are visited upon a seaman, who absents himself from his duty for more than forty-eight hours, are all "to the use of the owner or owners of the said ship or vessel." The general legal liability, to which I have alluded, is a sufficient answer to this part of the respondent's argument.

The question still remains, whether the sale and transfer of the brig and her freight discharge the owner from his responsibility to the mariner, and pass him over to the new owner, or to whomsoever may happen to be the owner when the wages are demanded. We have here a clear, unquestioned contract, made by the master of the vessel, the agent of her owner, binding personally upon both; the owner being the principal party in interest, and responsible to the seaman for all his rights under and by the contract. Can a party to this contract withdraw himself from it at his pleasure, and put a substitute in his place to fulfil his engagements? Can he change, and perhaps destroy the security on which the other party relied, turn him over to a stranger without his consent, and leave him to learn it for the first time, after his services

have been rendered, and his engagements performed on the faith of the contract as he made it? He proceeded on the voyage on the confidence he gave to the contract, and to the parties who were responsible to him for it. After months or years of hard and faithful service, the vessel is wrecked, so that he has no fund there for the payment of his wages: the master, who, in truth, is seldom much considered as a security, is ruined by the disaster; and when the seaman comes home to the place where his contract was made, to the owner of the vessel who was his owner and his party, he is told by him that he has sold the vessel to a beggar or a merchant in Russia; that all his engagements and responsibilities went with the ship and her freight; and that the mariner must follow them for his wages. There is something to my notions of justice so shocking in such a reply to such a demand, that, unless I am bound by some authority I may not resist, I can never yield to it.

It is necessary to examine the authorities cited to maintain this ground of the defence. The case of Hussey v. Allen, 6 Mass. 163, was an action for supplies furnished by the plaintiff for a sloop, alleged to be the property of the defendant. The facts were, that the sloop sailed from Edgarton to the Falkland Islands on a whaling voyage, on or about the 13th June, 1805, being then owned by the defendant. In the month of September following, the defendant sold half of the sloop to certain persons, and in December sold the remaining half. In December, 1807, and February, 1808, the plaintiff, at the request of the master, furnished the sloop, then in South America, with necessaries to fit her for sea, to enable her to return home. Neither the plaintiff nor the master knew of the sale of the vessel, at the time the supplies were furnished. She arrived in Boston in April, 1808. In this case the court held that the first owners of the sloop were not liable for these supplies, and the reason of the decision distinguishes it at once from our case. The contract was made and the supplies furnished after the sale, and when the defendant had no interest in the vessel; she was altogether the property of another. The master who made the contract was no longer the agent of the original owners, or authorised to bind them; the supplies were not for their use or benefit; they were neither expressly, or by any legal or equitable implication, parties to the contract. The difference between such a case and this is most obvious. Here, when the contract was made, the respondent was a party to it, was known as such; was bound by it, and is now endeavouring, not to disclaim engagements never made by him or by his authority, but to discharge himself, by his own act, unknown and not assented to by the other party, from those which were by

him and his authority. In the case of Aspinwall v. Bartlet, 8 Mass. 483, the opinion of the court is very briefly given, and not with any satisfactory certainty or explanation; but, by adverting to its circumstances, we shall see how widely it differs from that before us. It was an action of assumpsit for wages. The plaintiff shipped as a mariner on a voyage from London to some port in Spain. The ship had previously sailed from Plymouth in Massachusetts, being then owned by the defendant and commanded by one Bartlet. She arrived at London and was virtually sold to a London house, who were to victual and man her. After this disposal of the vessel, the master, who sailed in her from Plymouth, had no charge or concern with her, and another person was appointed her master by the new owners. Neither the former master nor owners had any interest in her voyage from London. The master testified that he never shipped the plaintiff or any of the crew for that voyage; nor had he ever seen the plaintiff, until the return of the ship from South America to Plymouth. We see, then, that the vessel was sold and delivered to the new owners, and a new master appointed by them, with whom, as their agent, the contract with the plaintiff was made. He had no contract of any kind, express or implied, directly or indirectly, with the original owners, and it is difficult to conceive any principle of law or equity in support of such a claim. The case of Lamb v. Durant, 12 Mass. 54, contains a declaration, which could not be denied, that where a ship at sea is transferred, the purchaser takes her subject to all incumbrances upon her before notice of the transfer. So far as this has an application to our case, it is in affirmance of the principle that an unknown transfer does not impair rights previously existing.

The case of Brooks v. Dorr, 2 Mass. 39, in its principle, has a bearing upon that we are considering. The ship was captured on her voyage to Europe, detained eight months and released, proceeded on her voyage, and delivered her cargo. When the owners received notice of her capture, they abandoned to the insurers, and, of course, executed an assignment of the vessel to them. A mariner, taken on board the capturing privateer, was carried into France and imprisoned, but afterwards discharged and returned home. It was adjudged that he was entitled to his wages until his return home, from the original owners, and not from the insurers. It was contended, with more plausibility than is found in our case, that by the capture the contract between the owners and the seamen was dissolved, or at least determined from that time; but that if the plaintiff was entitled to wages he must claim them of the underwriters, who became to all intents the owners of the ship after the abandonment, in whose employment the plaintiff was,

the defendants having no interest in her. Chief Justice Parker, in giving his opinion on this case, says: "The principle now contended for would produce infinite confusion and vexation to mariners, to whom every facility should be given by the law for the recovery of their wages. Instead of looking to the owner, with whom they contracted, and whose responsibility they knew, they are to be turned over to twenty or more underwriters, whose names they never heard, and of whose interest in the ship they are wholly ignorant. Such a principle cannot be maintained in this country, and probably never has been in any other." Judge Thatcher supports the same doctrine, and on the same principle. "Owners," he says, "and their circumstances are known to mariners, but they have no means of knowing underwriters." Judge Sedgwick says: "The plaintiff ought not to be shifted off from the defendant, with whom he made his contract, to the underwriters, to whom he is a stranger;" and Chief Justice Dana concurred. On authority, then, as well as on what seems to me to be the clear justice of the case, I am of opinion that the sale of the brig Caroline by the present defendant did not discharge him from his contract and the liabilities arising out of it, with the libellants for their wages, even independent of the consideration that the wages were actually earned by services antecedent to the transfer of the vessel.

2. The question remains, what amount of wages are the libellants entitled to recover? This has more difficulty in it; because, if judicial decisions have settled it in their favour, neither the authority nor the reason of these decisions is, to my understanding, clear and satisfactory. Are the libellants entitled to recover their full wages to the arrival of the brig at Buenos Ayres, agreed to be the last port of delivery, the place of the discharge of the outward cargo, and in addition thereto, for half the time she lay in that port?

I will first take the English books on this question. Abbott, in his treatise on Shipping (page 447), gives the law thus: "The payment of wages is generally dependent upon the payment of freight; if the ship has earned her freight, the seamen who have served on board the ship have, in like manner, earned their wages. And, as in general, if a ship, destined on a voyage out and home, has delivered her outward bound cargo, but perishes on the homeward voyage, the freight for the outward voyage is due, so in the same case the seamen are entitled to receive their wages for the time employed in the outward voyage and the unloading the cargo, unless, by the terms of the contract, the outward and homeward voyages are consolidated into one: and if a ship sails to several places, wages are payable to the time of the delivery of the last cargo." If this is the law, it certainly embraces the case

before us, and confines the rights of the libellants to the time when the outward cargo was unloaded, even if we had not the additional circumstance that they commenced taking in the home cargo the day after the brig was unloaded; that is said to be a clearer case than if she had remained idle, waiting for a return cargo, in which case there might be some show of reason for dividing the time between the two voyages. Abbott does not hint at any such decision on the question of wages: his postulate is intelligible and just, to wit, that the seaman has his wages for the outward voyage, and the reason is that, for that voyage, the owner has earned his freight by the services of the seaman; but the principle and the reason end with that voyage, and it should seem that when we ascertain when that voyage did end; when the freight for that voyage was fully earned; then we ascertain the time to which the seaman is entitled to his wages. But when has it been pretended that the outward voyage does not end, and its freight become due, on the delivery of the cargo? How are we authorised to continue this right of the seaman beyond the reason on which it is founded, and contrary to the truth and reason of the case; for the detention of the vessel, after the discharge of the cargo, has very seldom any reference to that cargo of her outward voyage, but relates to the procurement and loading of the return cargo for the homeward voyage? For the law as he gives it, Abbott cites an anonymous case (1 Ld. Raym. 639) which shows he did not understand this case as it has been taken in some of our courts. It was upon a motion for a new trial, in an action for seamen's wages, when Chief Justice Holt said, "that if a ship be lost before the first port of delivery, then the seamen lose all their wages; but if after she has been at the first port of delivery, then they lose only those from the last port of delivery." This note of the case was given to the reporter by Jacob; and what was meant by the words "from the last port of delivery," is not very intelligible. We certainly get no information of what is to be done with the intermediate time between the arrival at and the sailing of the vessel from that port.

In another case (1 Ld. Raym. 739) it was ruled by Holt, that "if a ship be bound for the East Indies, and from thence to return to England, and on her return she is taken by enemies, the mariners shall have their wages for the voyage to the East Indies, and for half the time that she stayed there to unlade and no more." We have here an example how loosely some of these notes of what falls from the court are made. In the former case, Holt is made to say, that the seaman shall lose his wages, only from the last port of delivery; which on a strict construction would imply, that he should have his wages up to the time of the sailing of the vessel, inasmuch as the wages from and

not at that port, are all that he loses; a larger grant to him than has ever been accorded by our courts in their utmost liberality to mariners; but in the subsequent case, a few years after, the same chief justice says, that where a vessel is lost on her homeward voyage, the seaman shall have his wages for half the time the ship stayed at the outward port to unlade; thus giving a rule as much narrower than that adopted by our courts, as his former one was broader. The wages are not to be paid for half the time the vessel is detained, although a forced construction might give it that meaning, but only for half the time she is detained to unlade, that is, for half the time employed in unloading, or for that purpose. A note by the reporter shows that he understood Lord Holt to give the rule in this restricted sense. It is as follows: "It should seem reasonable that the mariners should have their wages for the whole time during which they were unlading, because their wages during that time are payable in respect of the outfit and carriage which is saved." Here we have Abbott's rule and his reason for it. The reporter thinks that Lord Holt did not go far enough in giving the wages only, for half the time spent in unlading the outward cargo; but that they should be paid for the whole time they are thus employed.

In an anonymous case (12 Mod. 408) very briefly reported, Lord Holt is represented as giving another rule different from both the others. "If a ship go freight of an outward voyage, the seamen shall have their whole wages out, but if on their return to England the ship be taken, or other mischief happen, whereby the voyage homeward is lost, they shall have but half the wages for the time they were in harbour abroad." But in the same book (Id. 442) it is said, by the court: "In respect to seamen's wages, the usage is, if the ship be lost before her arrival at the port of delivery, they lose their wages out. If she arrive safe in that port, and is lost on her homeward voyage they have their wages out, but lose their homeward wages." Here the court assert the doctrine given by Abbott, provided the wages out shall be understood to embrace the time occupied in unlading, which may be done without a forced construction.

On this review of the English cases, we find nothing to maintain the doctrine of our courts, dividing the time of detention between the outward and the homeward voyages, but the doctrine of Lord Holt (12 Mod. 408) which is entirely inconsistent with the opinion of the same great judge in other cases, and supported by no known principle or satisfactory reason; on the contrary, the whole legal reasoning on the subject, the policy and principle on which wages are paid, are adverse to this doctrine, making the wages payable only for the outward voyage, and terminating that voyage with the delivery of the outward cargo. And so Abbott understands the law to be with a full knowledge of all the English decisions. It should be remarked, too, that the anonymous case (Id.) does not give the rule taken by Judge Peters, who divides the time, giving full wages for half of it; whereas in that case half the wages for the whole time the vessel was in port are given. It is true, the result is the same to the seamen, but the principle, if it have any, is different.

I shall briefly turn to the American cases, and if they are sustained by good reasons and sound principles, it will be no objection to them with me that they are deficient in foreign precedents.

In the case of Giles v. The Cynthia [Case No. 5,424] Judge Peters says: "There can be no doubt of the principle that wages are due to seamen in cases of capture or wreck, to the last port of delivery, and for half the time the vessel stayed there. This is settled law in this court." No case is cited, no reason given, no principle invoked to maintain or explain this opinion. It is the first reported decision of this court on this point, unless we may regard as such an incidental dictum of the same judge in the case of Bordman v. The Elizabeth [Id. 1,657], where he says: "The seamen must receive wages to the last port of delivery, and for half the time the vessel stayed there." In the case of Johnson v. Sims [Id. 7,413], and also in that of Cranmer v. Gernon [Id. 3,359], the same decree is pronounced, and still without any authority cited, or reason given for it.

Judge Washington meets this question in the case of Thompson v. Faussat [Id. 13,-954], and admitting the difficulty of the case before him, says: "That whenever the vessel is lost on her return voyage, her arrival at the last port of delivery of the outward cargo, or at the last port of destination, if there be no cargo, fixes the time to which full wages are allowed;" thus far this most excellent and learned judge proceeds on known principles and unquestionable authority; but he goes on to say, "that one half the time of her stay there should be added to the outward voyage and the other half to the homeward voyage, and be considered as parts thereof." But why should this be done? The judge gives us no reason, no authority. He had before fixed the boundary of the allowance of wages when a vessel is lost on her homeward voyage; and why he afterwards passes that boundary, enlarging it indefinitely, is not explained. Indeed the boundary assumed by him is even more confined than the English rule, for it stops at the arrival of the vessel at the port of delivery, and does not take in the time occupied in discharging and delivering the cargo.

In the case of Jones v. Smith [Id. 7,497], the court of Maryland seems to have taken another rule, different from any we have before found abroad or at home. That court did not divide the time between the arrival of the ship at the port of delivery and her

sailing from thence; that is the time she stayed there, but took the time when she was unladen as the first point, and the day of her sailing for the second, dividing the time between them and giving wages accordingly; making a difference in favour of the seamen, as they received full wages to the intermediate day between the unlading and departure of the ship, instead of between her arrival and departure. Such a variety of incongruous rules ought to drive us back to the principle on which wages are given in such cases, and then we shall be on sure ground always consistent and safe.

In the case of Galloway v. Morris, 3 Yeates, 445, Chief Justice Shippen, speaking for the court, says: "Where a vessel has been captured the wages of the seamen are lost from the last port of delivery, and so has the law been held ever since the case in 1 Ld. Raym. 739." We must remark in the first place, that the chief justice makes no suggestion of dividing the time of detention between the outward and homeward voyages, which has been held, at least in our courts, since the case cited by him from Lord Raymond, and antecedent to the delivery of his judgment. Secondly, that the case in Lord Raymond does not state the law to be that the wages are lost from the last port of delivery, but "for half the time that they stayed there to unlade." In the third place, that the expressions of the chief justice are those used by the court in the case in Lord Raymond, upon the uncertainty of which I have already remarked.

The doctrine of allowing wages for half the time the ship remained in the outward port, as far as I have been able to trace it, was first established in this court, unless we should except the doctrine in the anonymous case in Modern Reports, by Judge Peters, as early at least as 1798, and afterwards found its way into the courts of Massachusetts. In the case of Hooper v. Perley, 11 Mass. 545, in 1814, Chief Justice Parker says: "The general rule, as to wages of seamen, which has been for many years recognised and uniformly adopted in our courts, is, that if a ship has earned one or more freights, and is afterwards lost before completing the voyage for which the seaman was hired, he is entitled to his wages up to the last port of delivery and for half the time that the ship lies in that port." It appears to me that there is a want of connection between the premises and the last branch of the conclusion of this judgment. The earning of the freight is the given ground of the seaman's right to wages: and yet the wages are earned indefinitely beyond this point, through a period when no freight is earned. The earnings of freight is determined by the delivery of the cargo, but the vessel may, and often does, stay at the port for many months after that delivery, for objects having no possible connection with the outward voyage or the freight earned by it. In the margin of the

book, and opposite to this opinion of the chief justice, we find a reference to Abbott, to 1 Pet. Adm. 192 [note to Relf v. The Maria, Case No. 11,692], and to Comyn on Contracts (page 372), as the authorities, we may presume, which sustain the judgment of the court. I think we have seen that Abbott is very far from supporting any such doctrine; the case of The Cynthia certainly does; but without assigning any reason or authority for it; and Comyn literally quotes Abbott as I have done, and also recites the cases in Ld. Raym. 639, 739. In not one of these cases, as we have seen, is the doctrine of Chief Justice Parker advanced. In all these books "the time employed in the outward voyage and the unloading the cargo;" and the "time of the delivery of the last cargo," are made the most favourable termini of the seaman's right to wages; and, with the exception of the suggestion in 12 Mod. no intimation is given in any English case I have seen, certainly in none of those referred to in the case of Hooper v. Perley, of extending the claim of wages over half the time the vessel stayed in the port of delivery. The supreme court of Massachusetts acting, it is presumed, on the same mistaken foundation, continued to assert this doctrine in the cases of Locke v. Swan, 13 Mass. 76, and Swift v. Clark, 15 Mass. 173.

I shall close this examination of discordant and unsatisfactory adjudications, leaving us at last without a rule to guide and govern us, with one of commanding authority in any legal inquiry, and especially on a question of maritime contract. In the case of The two Catherines [Case No. 14,288], Judge Story says: "It is, in my judgment, perfectly clear, that the seamen are entitled to wages up to the time of the ship's arrival at Ivica, and during half the time the ship remained there; for at that place the homeward voyage commenced." This doctrine is not new in our courts. It was early decided in the supreme court of my native state after full argument, and about the same period adopted by a venerable judge of our country. It appears to me to be a natural result of the principles held by Lord Holt. 12 Mod. 409, 442, and Ld. Raym. 639, 739." The judge also refers to Brown v. Benn, 2 Ld. Raym. 1247, which relates only to what shall be deemed a port of delivery; also to Hernaman v. Bawden, 3 Burrows, 1844, which were on questions of freight. In this case of The Two Catherines, I shall, with a true and deep sense of the deference which is due to the judge who decided it, take the liberty of analysing his opinion, and the reasons he gives for it. The first reason is, "for at that place the homeward voyage commenced." This is precisely the point or test to which I would bring this question. Let it depend upon the commencement of the homeward voyage; or, what must be the same thing, the termination of the outward voyage. Where is au-

thority or the reason to say that the one ends and the other begins, when the ship has been half her time at her port of delivery? Can it be denied that, in point of law, the outward voyage is terminated by the delivery of the cargo, which may always be ascertained, and that, in point of fact, the discharge of the vessel almost universally takes place very soon after her arrival, although she may be afterwards detained a long time by waiting for a return cargo, or other circumstances having no connection with the outward voyage or its cargo? The judge says: "At that place the homeward voyage commenced." But when did it commence? This is the difficulty, and no answer or explanation is given to it. In that case the ship went in ballast to Ivica for a cargo of salt, and can we say that the homeward voyage did not commence when she began to take the salt on board? Can we attach the time and labour so employed to the outward voyage? In fact this division of the time the ship was detained at Ivica, between the outward and homeward voyages, was not a prominent or important question in the case. One principal question was whether the ship, having discharged her cargo at Gibraltar, and gone to Ivica in ballast for her return cargo, Gibraltar was not the terminus of the first voyage. On this point the judge differs from Judge Washington's opinion in the case of Thompson v. Faussat, who thought the outward voyage ended at the place where the cargo was unloaded, while Judge Story carries it on to the place to which the vessel went in ballast for her return cargo, considering it to be an intermediate voyage which constitutes no part of the return voyage. But should it not be affirmatively a part of the outward voyage to support the claim for wages?

It is not for me to decide between these learned judges, nor does the case I have under consideration call for it; but it does seem to me that Judge Washington has the better reason; and gives us a more plain and practical rule, and more consonant with the principles of the law than that adopted by Judge Story. In the case of The Two Catharines, it does not appear that when the vessel sailed from Newport for Gibraltar, she was to proceed on, after discharging her cargo, to Ivica for a return cargo; nor that Ivica was in contemplation as a port to which she was to go at any time or for any purpose. The learned judge says: "The ship's having gone from Gibraltar to Ivica in ballast, does not vary the case any more than if the whole of the outward voyage had been performed by the ship in ballast." This is true, if the outward voyage was from Newport to Ivica and did not end at Gibraltar, or if Ivica can be considered as a port of delivery; but this is the question, the disputed point. Did the outward voyage end at Gibraltar, the place where the outward

cargo was discharged, or may it be continued to Ivica, to which port the ship went to obtain a return cargo, and which, when the outward voyage was commenced, was not in contemplation of any of the parties to the contract for that voyage, either expressly or by general words of description? In such a case, was Ivica a port of delivery? When a ship sails for a designated port in ballast, that port is the port of her destination, and whether she be loaded or goes in ballast, her outward voyage is from the port of her departure to the port of her destination, and the wages are due there, because it is a part of the described voyage, and not as a port of delivery. We have seen, by Abbott, that if the ship be lost on her home voyage, the seamen are entitled to wages "for the time employed in the outward voyage and the unloading the cargo; but if there be no cargo to be unloaded, they are nevertheless to be paid for the voyage." But is not this a very different case from one in which the ship sails for a given port, with a cargo, to unload it there, and afterwards to seek, where she may, in ballast for another cargo? There can be no doubt or question raised about what is the outward voyage in the first case, and that the wages are earned on her arrival; whereas, about the other case, two eminent judges have differed. Why is the passage to Ivica, or any other place, to be attached to the outward voyage, with which it has no apparent or ordinary connection; and when its object was to obtain cargo for the home voyage, which is thus clearly and essentially connected with it? After the discharge of the outward cargo, it depended on markets and various other circumstances, to what place she might proceed for another load; and the outward voyage is made to wait on all these contingencies to find its termination, when its obvious and natural end would seem to be, when its object and business was done by the delivery of the cargo. So how can we call it the last port of delivery, when the whole was before discharged at another place? Judge Story mainly relies, for his doctrine, on the admitted law, that if the vessel originally sails in ballast, the seamen have their wages in the same manner as if she were loaded; and argues that "it can make no difference that the vessel is in ballast on the intermediate, instead of the outward voyage." I have endeavoured to show that there is a difference, and that the claim of the seamen rests on a ground in the one case, which they have not in the other. In this question, however, between two great judges, that which is material to us was not moved, that is, the claim of wages for half the time the vessel remained in port, which, in our case, was the port of delivery of the outward cargo, as well as of her loading and departure for home. We have to decide the naked question, whether if a ship goes

from a port in the United States to a foreign port, and there, having discharged her cargo, remains several months, more or less, after such discharge, and is lost on her homeward voyage, the seamen are entitled to their wages for half the time of the detention of the ship, whatever may have been the cause of her detention or her employment while she remained there.

The most important question, in the case of The Two Catherines, as declared by Judge Story, was whether the seamen can claim wages as such for the homeward voyage, having saved from the wreck, property more than sufficient in value to cover all the wages. The question I have to decide was assumed by the judge, arguendo the points I have stated, but it was not made by the counsel on either side, it was not a question in the case. I return to the question, "when did the homeward voyage commence" in the case before us? Did it not commence when the outward voyage ended? There was no intermediate voyage or time hanging between the outward and the homeward voyages, and belonging to neither, if this can be in any case; but the second necessarily began when the first ended, and the first necessarily ended when the second began. What authority is there for saying that the outward voyage continues for three, six, or twelve months after the arrival of the vessel at her outward port and the complete delivery of her cargo there? How can we say that the outward voyage continued during the time when the brig was actually taking in her return cargo? What connection in fact, or in law, had this employment of the mariners with the outward cargo, or its freight or any thing belonging to it? Judge Story put the law on the question, "when did the homeward voyage commence?" It should rather, in our case, be, when did the outward voyage terminate? unless, as I believe, the time is the same for both. When then, by clear and undisputed evidence, it is shown precisely when the one did end and the other did begin, can I apply to the first, employment and services which clearly belong to the latter? Can I charge against the first, wages clearly earned by labour for the second? It cannot be questioned that if the ship be lost on her homeward voyage, the wages for that voyage are lost with her, because her freight is lost, and the claim of wages is therefore clearly attached to the goods for which the freight is payable; and why not to the putting of them on board, as well as to the carrying of them in safety; or, at least, I may say on what principle, by what reason can these services or the wages earned by and payable for them be made a charge against the outward cargo and voyage? After thus declaring the law, the learned judge refers, in proof of it, to the decisions in the state courts of Massachusetts, which I have already examined, and shown, as I think, not to be supported

by the authorities cited for them: nor is any legal principle or reason attempted to be given for their justification. The judge then proceeds: "It appears to me to be a natural result of the principles held by Lord Holt. 12 Mod. 409, 542, and 2 Ld. Raym. 639, 739." With the legal and logical mind of Judge Story, thoroughly accustomed to such researches, it would have been most satisfactory, if he had explained the process of reasoning by which he came to the conclusion he has adopted, from the cases he has referred to. So far as he asserts the right of the seamen to wages for the outward voyage, it is clear enough, but in the extension of this right over half the time the vessel may remain in port, however long or whatever may be the cause of her detention, I confess I cannot discover how or where this doctrine is to be found in the cases cited. The principle that the wages end with the outward voyage, and that that voyage ends with the delivery of the outward cargo, is much more manifest and reasonable to my mind. Why shall we adopt as a rule an arbitrary division of the time the ship remains in the port, unjust and untrue in a vast majority of cases, when the law gives us a principle reasonable, consistent, and just, for every case? There is no occasion for the arbitrary assumption of a general rule, when it happens so rarely, if it can ever happen, that the true rule of right may not be found in every case.

I have taken this review of the cases on the subject of our inquiry, with a real desire to conform myself, if I could do so, to the course of decisions heretofore adopted in this court; but I am obliged to say, and my reasons have been shown for it, that I can find nothing in the adjudications here or in England that I can safely rely upon for the doctrine contended for by the counsel for the libellants; nothing so certain, consistent and clear that it should not be disturbed; nothing so uniform and authoritative in the decisions, that I am judicially bound to submit to them, against the convictions of my own judgment. In allowing the libellants their full wages, from the time they respectively shipped to the delivery of the outward cargo, I shall act on a principle which can neither be denied nor misunderstood. Were I to go beyond this, I should be incapable of giving a reason for it, either of my own suggestion or furnished by any of the judges whose opinions have been referred to.

I would add another observation upon the case of Thompson v. Faussat, although it is not in place here. It was decided in 1815, and Judge Washington then considered the law, as to the wages seamen had a right to claim, in such a case as that, to be "quite unsettled." He says he had met with no case which precisely resembles it, in any book of reports; nor with any principle in the ordinances or usages of other nations,

which applies to it. Now the case was of a vessel that sailed on a voyage from Philadelphia to a port in France. She arrived at St. Jean de Luz, and after discharging her cargo, then proceeded to Bayonne. A return cargo was provided for her at Bordeaux; but the master received orders to remain with the vessel in France until September. On the 25th September she sailed from Bayonne, and arrived the next day at the port of La Teste, where her return cargo was received and taken on board. She sailed from that port on her homeward voyage and was captured. The question in the case, having an application to ours, was, whether the wages should be given from La Teste, the last port of lading and departure, or from St. Jean de Luz the port of discharge of the outward cargo. The district court decided for the latter place, and the decree was affirmed by the circuit court.

Decree: That the libellants do severally have and recover their full wages, as stated in the shipping articles, from the time they shipped, to wit, the 30th July, 1833, to the 4th January, 1834, both inclusive; deducting from each of the said libellants the money paid to them respectively, and such other credits as the respondent is legally entitled to.