THE GEN. McPHERSON.

(District Court, D. Washington, N. D. March 28, 1900.)

1. SEAMEN—STATUTORY DAMAGES FOR DELAY IN PAYMENT OF WAGES.

Under Rev. St. § 4529, as amended by Act Cong. Dec. 21, 1898 (30 Stat. 756), which provides that every master or owner who refuses or neglects to make payment of a seaman's wages at the time of his discharge, or within two days after the termination of his contract, without sufficient cause, shall pay to the seaman a sum equal to one day's pay for each and every day during which payment is delayed, it is sufficient cause to exonerate the owners from such liability that while on a voyage the master wrongfully took possession of their vessel, converted the greater part of the cargo, which was the property of the owners, to his own use, and refused to return with the vessel as ordered, and that the owners, who were without money to pay the crew, at considerable expense obtained possession of the vessel, and brought it within the jurisdiction of the court, where it could be, and was, subject to sale for the payment of the wages due.

2. SAME.

Quære whether the liability created by such statute is enforceable by a suit in rem against the vessel, or is a penalty, only recoverable by an action in personam against the master or owner.

**3.** TREATIES—CONSULAR CONVENTION WITH GERMANY—RIGHT OF CONSUL TO REPRESENT GERMAN SUBJECTS.

Article 8 of the consular convention between Germany and the United States, of December 11, 1871, authorizing German consuls to act as legal representatives of the German emperor's subjects, does not constitute such consuls administrators of deceased persons, or authorize a consul to recover wages due a deceased seaman who was in life a German subject, unless he represents heirs who are entitled to the money and who are German subjects.

**4.** SEAMEN—RIGHT TO WAGES—FORFEITURE.

A seaman who is shipped by the owners for a voyage is not deprived of his right to wages because he remained with the vessel after she was wrongfully taken possession of by the master, and diverted from her voyage, in a distant port, where there was no court accessible through which the seaman could collect the wages due him, but under such circumstances he was justified in staying with the vessel, and is entitled to wages until returned to the port of discharge.

**5.** SAME—POWER OF MASTER TO BIND VESSEL.

Libelant, as supercargo, was given verbal authority by the owners of a vessel to sell her cargo on arriving at the port of destination, and was to receive as sole compensation a percentage of the proceeds. On arriving at such port the master fraudulently refused to permit libelant to sell the cargo, and himself took possession of both cargo and vessel, devoting them to his own uses. Libelant remained with the vessel, and subsequently made a contract with the master to serve as cook for the master, his family, and the crew. *Held*, that at the time the master had ceased to represent the owners, and had no power to bind them or the vessel, and that libelant had no claim for wages enforceable against the owners or vessel.

In Admiralty. Suit by E. F. Graham and others against the schooner Gen. McPherson to recover wages as seamen.

Humes & Lysons, for libelants and interveners.

Brady & Gay, for claimant.

HANFORD, District Judge. This is a suit in rem, for mariners' wages. During the pendency of the case the vessel was sold under an order of the court, and by consent the proceeds have been partially disbursed in payment of the wages admitted to be legally due to several of the libelants. The libelant Graham has received the full amount of his wages for the time he was in the service of the vessel, but he makes a further demand for wages at the contract rate from the time of his discharge up to the time of final payment, under section 4529, Rev. St., as amended by the fourth section of the act of congress of December 21, 1898 (30 Stat. 756), which provides that every master or owner who refuses or neglects to make payment of a seaman's wages at the time of his discharge, or within two days after the termination of his contract, without sufficient cause, shall pay to the seaman a sum equal to one day's pay for each and every day during which the payment is delayed. This demand is resisted on the ground that the owners had no means to pay the wages of the crew at the termination of the voyage, nor until the vessel was sold, and payment from the proceeds authorized, by an order of the court. The claimants deny that the libelant Poole has any just claim or a lien upon the vessel for wages, on the ground that he performed no duty while the vessel was in the service of her owners, and that his only work on board the vessel was during a

time when she was, by the fraudulent conduct of her master, used
for his own purposes, in violation of orders from her managing owner,
in which fraudulent use said libelant voluntarily and knowingly as-
sisted. Mr. Hans Giese has come into the case as an intervener in
his official capacity as "imperial German consul," for the purpose of
collecting wages alleged to have been earned by one Charles Schultz,
deceased, who was regularly shipped as a seaman at the commence-
ment of the voyage, and continued in the service of the vessel until
his death. The claimants assert that Schultz forfeited his wages by
voluntarily and knowingly assisting the master in using the vessel
for his own purposes, contrary to orders, and they have not raised
any question as to the right of the German consul to appear as his
legal representative. These three are the only contested demands.

The following is a brief history of the voyage of the Gen. McPher-
son for which the several libelants claim wages: In the month of
June, 1898, the Gen. McPherson was dispatched from Astoria, Or.,
with passengers and a cargo, consisting of coal, lumber, shingles,
and miscellaneous hardware, belonging to her managing owner, on
a voyage to St. Michael and Kotzebue Sound, with orders to sell the
cargo if a market was found at the places named, and then to return
to Seattle or Portland, and subsequently written orders were sent
to the captain at St. Michael, directing him to return to Seattle
speedily, as the vessel had been chartered for a voyage from Seattle
to Honolulu. Among the passengers who went from Astoria was
Mr. Phillips, owner of one-half of the vessel. The vessel was under
command of Capt. James B. Nielson, who took his family with him,
and the libelant Poole went as supercargo and agent of the owners.
Before the vessel left Astoria the managing owner, Mr. Donald H.
Smith, gave to the captain, Phillips, Poole, and the first mate verbal
directions to the effect that the captain was merely to have charge
of the navigation and perform the usual duties of master; that Poole
was to attend to selling the cargo, and to represent the owners as
agent at the ports and places to be visited, but he was not to be
intrusted with any money; and that the first mate was to act as
cashier, and receive the proceeds of the cargo, and whatever money
might be earned by the vessel as a carrier of freight and passengers;
and Mr. Phillips was to do nothing. Mr. Poole was not given bills
of lading nor invoices of the cargo, nor any written appointment as
an agent, nor furnished any money for contingent expenses, and his
name does not appear in the shipping articles as a member of the
ship's company, but he was given verbal authority to sell the cargo
and represent the owners as their agent, and by his contract he was to
receive as compensation 10 per cent. of the gross amount received for
the cargo if he should be successful in disposing of it, or, if the cargo
had to be brought back because unsalable, he was to be paid the sum
of $50. Mr. Smith appears to have been contented with giving verbal
directions as above stated, and neglected to have bills of lading for his
merchandise issued, and gave no attention to the manifest. Capt.
Nielson, taking advantage of this unbusiness-like proceeding, en-
tered himself as consignee of the cargo in the manifest, and on ar-
rival at St. Michael he called Mr. Phillips, Poole, and the first mate

together, and informed them that he was consignee of the cargo, and that he would not permit Poole to sell any of it, nor permit the mate to handle any money, but would take full charge of the business himself. This announcement was readily assented to by the mate, and the others made no protest. In the situation in which Mr. Poole found himself at St. Michael, he could not be expected to contend with the captain, who, besides having control of the vessel and crew in a place where courts and governmental authority were not readily accessible, was in possession of written evidence of title and a right to possession of the cargo. He could have done nothing in the interest of Mr. Smith, except to have reported what the captain had done, and he neglected to do even that much. The cargo could have been sold at once, as there was a demand at St. Michael for coal and lumber, but the captain refused to sell to those who offered to buy at prices which would have netted Mr. Smith a good profit, and proceeded with the vessel to Kotzebue Sound. On arrival there the cook of the vessel deserted, and Mr. Poole, at the captain's request, took the place of the cook, without any agreement being made as to his compensation. Without disposing of the cargo, several passengers were taken on board, and the vessel returned to St. Michael, and then, instead of disposing of the cargo and returning to Seattle, pursuant to orders, the captain returned to Kotzebue Sound, to spend the winter there, with the intention of using the lumber and coal in the vessel, and her stores for the maintenance and comfort of himself and family and the crew during the winter, and to be prepared to send out prospecting parties in the spring in the hope of discovering and locating valuable mines. The mate was discharged at St. Michael, with his own consent, but part of the crew, including Charles Schultz and Mr. Poole as cook, returned to Kotzebue Sound, and there appears to have been no protest on the part of any one against the conduct of the captain in disobeying orders to return to Seattle. In the month of November, 1898, Capt. Nielson made a written contract with Poole, agreeing to pay him, for his services as cook, wages at the rate of $60 per month from the 22d day of July, and Poole continued to act as cook for the captain and his family and the men on the vessel until some time in the spring of 1899, when he voluntarily left the vessel without being paid off. Mr. Smith, at considerable expense, went to Cape Nome, where he recovered possession of the Gen. McPherson, after she had been retaken from her dishonest captain by the United States steamship Bear, and, after incurring further expense in fitting her for service and furnishing supplies, she came to Seattle via St. Michael, bringing a number of passengers. Besides obtaining possession of the vessel, Mr. Smith recovered from Capt. Nielson a small amount of the proceeds received from sale of the cargo and earnings of the vessel while under Nielson's control, the total amount recovered from Nielson and earned on the homeward trip being less than his expenditures. Mr. Smith was without funds to pay off the crew on her arrival here, and the vessel had to be libeled and sold to pay their wages. From the evidence, it appears that Mr. Phillips is the only one of the owners possessed of any means or property other than an interest

in the vessel, and from his uncontradicted testimony Mr. Phillips appears to have been reduced so that his entire fortune consisted of $1,000 in money.

1. As to the claim of the libelant Graham of a right to recover wages after he was discharged from the vessel until the time of final payment, there is a serious question in my mind whether the statute authorizing such recovery is to be regarded as a penal statute, to be given a strict construction, which would require a seaman to enforce the penalty by a suit in personam against the master or owner. The statute requires the master or owner to pay a sum equal to one day's wages for each day's delay, but it does not in specific terms subject the vessel to a lien for this penalty, nor authorize its collection by a suit in rem. However, this question has not been argued before me, and I do not at this time intend to decide it. A seaman is only entitled to recover this additional pay when his wages shall have been withheld without sufficient cause, and I hold that, in view of the heavy losses sustained by the owners in recovering possession of their vessel and bringing her within reach of judicial process, so that all having claims against her might be protected, their inability to command the money necessary to pay off the crew is sufficient cause to relieve them from liability under this statute. The $1,000 which Mr. Phillips possessed would have been almost entirely absorbed if it had been devoted to paying the crew of this vessel, and I consider that he was justified in keeping that amount of money for other uses. Mr. Graham joined the vessel when she was in the far north, and presumably he was anxious to come to Seattle, where his home is. After leaving her, and while this suit has been pending, he has been earning wages in other employment. Under all these circumstances, I consider that it would be an injustice to allow him any amount in addition to what he has already received.

2. I consider that the intervener Hans Giese has not shown in his pleadings or evidence any legal authority to receive the wages earned by the deceased seaman Schultz, and the case will be dismissed as to him, unless he shall proceed promptly to amend his libel, and introduce further proof showing that Schultz has heirs entitled to this money, and that they are subjects of the German emperor. In his libel he asserts a right to appear as the legal representative of Schultz by virtue of article 8 of the consular convention between Germany and the United States, of December 11, 1871. But that article does not constitute a German consul administrator of the estate of a deceased person. On the contrary, it only authorizes German consuls to act as legal representatives of the German emperor's subjects. Now, Mr. Schultz ceased to be a subject of the emperor when he departed from this mundane sphere, and he has no rights for which the German consul need have a care, for his rights were terminated with his death. If he has any heirs, they may be Germans or citizens of the United States. The court will not presume anything as to their identity or nationality. But, as this question has not been raised until now, I will not arbitrarily, on my own motion, deny the German consul an

opportunity to present the facts, if he elects to do so promptly. The claimants defend on the ground that Schultz forfeited his wages by aiding and assisting Capt. Nielson in going off with the vessel, and appropriating the owners' property, but there is no evidence upon which I can convict the deceased seaman of fraudulent conduct affording any reason for forfeiting his wages. He was hired before the vessel started from Astoria, and rendered faithful services, earning wages while the vessel was pursuing the voyage on which she was sent by her owners. When the deviation commenced there was a considerable sum due him for which he had a right to hold the vessel, and he was entitled to return to Seattle in the vessel, or collect wages to the end of the voyage for which he contracted, and his traveling expenses from St. Michael to Seattle. He could not prevent the captain from taking the vessel where he pleased, nor leave the vessel and collect what was due at St. Michael, unless the captain would voluntarily pay it; for the court having jurisdiction to issue admiralty process is not accessible to sailors at St. Michael. Under these circumstances, even if Schultz knew that Capt. Nielson was acting fraudulently (which is not proven), he had a right to remain in the vessel, and to claim wages until his arrival at Seattle.

3. The relationship of the libelant Poole to the vessel is quite different. Capt. Nielson acted fraudulently towards him, as well as towards his employers, by taking from him the control of the cargo on arrival of the vessel at St. Michael. There was not at that time anything due to him as wages, and he had no right, under his contract with the owners, to hold the vessel for the compensation which he would have received if the captain had permitted him to make sale of the cargo. He simply remained in the vessel voluntarily, without any definite contract as to his duties or the wages to be paid to him, until long after the vessel had been laid up for the winter, and, when the contract was made to pay him wages at the rate of $60 per month for his services as cook, the vessel was not in the service of her owners, but was held adversely and fraudulently by Capt. Nielson. Under the circumstances described, the captain could not create a lien upon the vessel for the wages of a man hired to cook for him and his family while they were consuming the stores of the ship and depriving the owners of her use. I consider that the legal authority of Capt. Nielson to bind the ship by his contracts ceased when he unlawfully and piratically took control of her adversely to her owners. Mr. Poole is claiming wages under a contract which Capt. Nielson could not lawfully make as master of the vessel, for he was not at that time acting as agent of her owners.

The case will be dismissed as to all the parties above mentioned, but, if prompt application is made, leave will be granted to the German consul to amend his pleading, and introduce further proof to identify the heirs of Charles Schultz.