### EVERETT et al. v. UNITED STATES et al.

(District Court, W. D. Washington, N. D. December 3, 1921.)

Nos. 6159, 6193, 6192, 6227, 6234, 6308.

1. **Seamen ⬥⇒22, 27—May enforce claims for wages against the ship, owner, and master.**

   Seamen under the shipping articles have a threefold remedy for their wages against (1) the ship; (2) the owner; and (3) the master.

2. **Seamen ⬥⇒22—General owner liable for wages only when in privity with master.**

   The general owner is liable for seamen's wages only when privity with the master is shown.

3. **Seamen ⬥⇒22—Owner after sale of ship not liable for wages of crew employed by purchaser.**

   Where the owner of a ship makes a bona fide sale, and delivers possession and surrenders control to the purchaser, he is not liable for the wages of seamen employed by the master, who was hired by the purchaser the vessel being navigated by such master and seamen, and the voyage directed by the purchaser or his crew, and the fact that the sale was not consummated by a formal transfer or that security provided for in the contract was not given, and that the ship was still documented in the name of such owner does not change the status, where the crew were not misled thereby; the purchaser being for all purposes of the voyage the owner pro hac vice.

---

⬥⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Judgment ☞812(2)—Decree in rem for wages does not defeat right to recover deficiency in personam.**

A decree in rem for seamen's wages *held* not to defeat the right to recover the deficiency from the master, obligated under the shipping articles to pay such wages.

In Admiralty. Suit by W. Everett and others against the United States, the United States Shipping Board Emergency Fleet Corporation, and Tory Hedemark, heard with five other cases by Walter Starkey and others, by E. Gaupholm, by G. H. Beauchamp and others, by L. E. Oblom, and by P. Sognefest against the same respondents. Decrees for libelants against respondent Hedemark only.

These several causes were consolidated for trial. The several libelants seek to recover from the United States, the United States Shipping Board Emergency Fleet Corporation, as owner, and Tory Hedemark, master, balance due for unpaid wages for voyage from Seattle, Wash., and via ports to Sydney, Australia, thence to such other ports and places in any port of the world as the master may direct, and back to a final port of discharge to be designated by the master in the United States, for a term of time not exceeding twelve calendar months. The Agron was built by the United States Shipping Board, through the United States Shipping Board Emergency Fleet Corporation. The vessel was included in a contract of sale between the United States, represented by the Shipping Board and the National Oil Company, dated March 5, 1920. The contract was not recorded in any public record in the United States.

The contract of sale contains, inter alia, the following provisions: "Immediately upon the execution of this agreement the Fleet Corporation agrees to deliver into the custody of the buyer the said five hulls and five bills of material #500. The buyer shall accept delivery of the said hulls and bills of material where they are now, * * * and the buyer agrees at its own expense to complete the same at earliest date possible consistent with good workmanship. It is expressly agreed that the title to the said hulls and bills of material and any additions or improvements made thereto shall remain in the Fleet Corporation until the same shall be completed and documented, and the buyer shall have executed the mortgages and notes hereinafter provided for. The buyer hereby agrees to keep the said hulls * * * free from all liens. * * * The buyer agrees to pay the purchase price of each of said hulls and sets of machinery to the board in gold coin of the United States or its equivalent in current funds as follows: * * * Upon the completion and documentation of each of said hulls the buyer agrees to execute and deliver to the board a first mortgage on each vessel. * * * "

The purchase price was $85,000 for each vessel. The vessel was completed and outfitted and her machinery installed by the said National Oil Company. operating through its representatives or contractors, National Shipbuilding Company and J. H. Price Shipbuilding Company. No mortgage was given to secure the amount due under the contract. The ship was documented June 7, 1920, upon the affidavit of H. R. Bowen, Executive Assistant, Division of Supplies and Sales, managing owner and certificate of registry as follows:

"In pursuance of chapter I, title 48, Regulation of Commerce and Navigation, Revised Statutes of the United States, H. R. Bowen, of Seattle, Washington. executive assistant, Division of Supplies and Sales, having taken and subscribed an oath required by law, and having sworn that the United States, represented by the United States Shipping Board is the only owner of the vessel called the Agron, of Seattle, whereof Tory Hedemark is at present master. * * * "

Tory Hedemark was employed by the National Oil Transport Company, operating company for the National Oil Company, as master of the vessel, some days prior to the date that the vessel was documented. Hedemark was

not employed at any time by the United States or either of its agencies, nor was he designated as the master in the affidavit of Bowen. The seamen were employed by the master of the vessel, representing the National Oil Transport Company. No representations were made to the seamen as to the ownership of the vessel. The seamen knew the vessel was of a type built by the direction of the Shipping Board.

The vessel arrived at Balboa, January, 1921. The seamen not having been paid, and the vessel being out of supplies, the seamen applied to the United States consul for relief; the master being without funds. Provision was made for the seamen. Section 4577, R. S. (Comp. St. § 8368). Several days out from Balboa, the vessel, being short of fuel, by wireless came in contact with the master of the steamship Lake Fanbush, a Shipping Board vessel. The Fanbush took a line from the Agron. The Agron operated her engines, assisted in propelling the vessel, and both vessels reached port with less than a day's delay. Upon arrival at Port Balboa, the master of the Fanbush libeled the Agron for a large sum for salvage. The seamen intervened, and sought to impress upon the vessel the unpaid wage claims. The libel for salvage was dismissed. The case proceeded to decree upon the intervening libels, the unpaid wages were impressed upon the vessel, the vessel sold, and the proceeds applied to the payment of the wage claims. The proceeds were insufficient to pay the claims, and this action is to recover from the master and the owner the balance, together with the cost of transportation and maintenance of the seamen from Balboa to the home port.

The respondents deny ownership, asserting the contract of sale, and contending that the National Oil Company was owner pro hac vice, having equipped and manned the vessel. The seamen were the servants of the National Oil Company, employed to navigate and direct the motion of the ship, as well as places where the ship should go. The respondents contend, further, that the seamen, having proceeded against the vessel, are estopped from proceeding in personam. Libelants contend that, the contract of sale not having been consummated by the execution of the necessary documents and the vessel documented in the name of the United States, the United States thereby assumed ownership, and recognized Hedemark as its master and agent, and is chargeable as owner.

James Kiefer, of Seattle, Wash., for libelants.

MacCormac Snow, of Portland, Or., for the United States and respondent United States Shipping Board Emergency Fleet Corporation.

Bronson, Robinson & Jones, of Seattle, Wash., for respondent Hedemark.

NETERER, District Judge (after stating the facts as above). [1] The seamen under the shipping articles have a threefold remedy for their wages against (a) the ship; (b) the owners; and (c) the master. There is no diversity to this rule, so far as I am advised. The laws of the United States as well as those of England have provided such remedy. Bronde v. Haven, 4 Fed. Cas. 211; Farrell v. McClea, 1 Dall. 392, 1 L. Ed. 192; The Susan, 23 Fed. Cas. 443; Skolfield v. Potter, 22 Fed. Cas. 299; Russell v. Rackett (D. C.) 46 Fed. 200; Wysham v. Rossen, 11 Johns. (N. Y.) 72; Smith v. Oakes, 141 Mass. 551, 5 N. E. 824, 55 Am. Rep. 487; Temple v. Turner, 123 Mass. 125; Calvin v. Huntley, 178 Mass. 29, 59 N. E. 435 (1901).

[2] The general owner is liable for seamen's wages only when privity with the master is shown. Hussey v. Allen, 6 Mass. 163. This principle is applied by Judge Hanford in The General McPherson (D. C.) 100 Fed. 860, where at page 865 he says:

"I consider that the legal authority of Capt. Nelson to bind the ship by his contract ceased when he unlawfully and tyranically took control of her adversely to her owners."

In this case the master was engaged by the owner, and afterwards he appropriated the cargo and ship, and before the master secured the vessel he employed one Poole as cook, and did not pay him, and Poole sought to impress his claim for wages against the ship.

[3] An owner may not escape liability for wages by transfer of ownership pending fulfillment of articles, Bronde v. Haven, 4 Fed. Cas. 211; nor during a voyage, Sheppard v. Taylor, 5 Pet. 707, 8 L. Ed. 269; nor by abandoning the ship to underwriters, Brooks v. Door, 2 Mass. 39; but where the owner makes a bona fide sale, and delivers possession of the ship, and surrenders control to the purchaser, he is not liable for the wages of the seamen employed by the master, who was hired by the purchaser; the vessel being navigated by such master and seamen, and voyage directed by the purchaser or his crew. U. S. v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403; The Craigallion (D. C.) 20 Fed. 747; The T. A. Goddard (D. C.) 12 Fed. 174. And the fact that the sale was not consummated by execution of formal transfer, and the ship still documented in the name of such owner, would not change the status. Aspinwall v. Bartlet, 8 Mass. 483; The McPherson, supra. Failure to take a mortgage was the hazard of the respondents, which cannot affect the seamen. The contract of sale provided for a mortgage to secure the purchase price, the title was retained in the respondent conditioned upon payment. The security was not affected; only the terms of payment and the character of the lien. The registry may be shown by parol to be conditional rather than absolute ownership, where third parties are not misled. Morgan's Assignees v. Shinn, 82 U. S. (15 Wall.) 105, at page 110 (21 L. Ed. 87), where Justice Strong said:

"It is not questioned that an instrument absolute in its terms may be shown by parole evidence to be only a mortgage. It is true that if trust and confidence have been reposed in it by third parties, with the honest belief that it was indefeasible, and such parties have been misled by its form, they have a right to insist that, as to them, it shall be what upon its face it purports to be."

While this was not an expression having relation to admiralty, the same rule has application. In Thorp v. Hammond, 79 U. S. (12 Wall.) 408, 20 L. Ed. 419, one of several general owners sailed a vessel on shares under an agreement whereby he became the charterer, hiring his own crew, paying and victualing them, paying half the port charges, retaining half the net freight after the port charges were taken out, and paying the other half to the general owners, he was held to be owner "pro hac vice," and is said to be personally liable for tortious collision with another vessel, and the other general owners were not liable. At page 416 of 79 U. S. (20 L. Ed. 419) the court said:

"It is clear, therefore, that he must be considered as having been the owner 'pro hac vice.' This accords with the authorities generally. Notwithstanding this, however, and though Hammond was the special owner, it has been contended on behalf of the libelants that all the general owners are liable for the torts committed by the schooner while she was thus let to charter. The

Circuit Court was of opinion that they are not, and this court is equally divided upon the question. But we are all of opinion that the owner pro hac vice is liable, and that he may be charged in this proceeding."

Justice Clifford in Reed v. U. S., 78 U. S. (11 Wall.) 591, at page 600 (20 L. Ed. 220), in construing a contract of affreightment said:

"Charterers or freighters may become the owners for the voyage without any sale or purchase of the ship, as in cases where they hire the ship and have by the terms of the contract, and assume in fact, the exclusive possession, command, and navigation of the vessel for the stipulated voyage."

Justice Field, in Leary v. U. S., 81 U. S. (14 Wall.) 607, at page 610 (20 L. Ed. 756), said:

"If the charter party let the entire vessel to the charterer with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated."

And the general owner in neither case would be liable. The principle stated in these cases has application here, where the purchaser assumed exclusive possession, command and navigation. . Justice Story in Marcardier v. Chesapeake Ins. Co., 8 Cranch. 39, at page 49 (3 L. Ed. 481), said:

" * * * A person may be owner for the voyage who, by a contract with the general owner, hires the ship for the voyage, and has the exclusive possession, command and navigation of the ship. * * * "

In which case the owner is absolved from responsibility. The statement in the libelant's brief that the National Oil Company "was a tort-feasor in operating, if it did operate, the Agron," cannot operate to the libelant's advantage. A tort committed against the respondent cannot create a right for the seamen. In any case to bind the owner there must be privity between him and the master. If the master is employed by another who has possession of the ship, and as tort-feasor operated it without the owner's consent there would be no privity and no responsibility could attach.

The seamen in the instant case were not misled. They made no inquiry. The seamen, while testifying to an impression that the ship is of a style built by the Shipping Board, knew nothing about the ownership or registry certificate, and made no inquiry, and no representation of any fact or inducement of any kind as to ownership by the United States was made. The ship was staunch, the motive power adequate, and the seamen had a lien for their wages. And in view of all the circumstances there was no occasion to make inquiry as to the financial responsibility of the owner. Hedemark, the master, employed by the National Oil Company through its representative, the National Oil Transport Company (and he testified he continued in that relation), made no representation to the seamen or claim upon the respondent until he was unable to secure funds from his employer and after the vessel was libeled.

It is contended that by analogy with The Dubuque, 7 Fed. Cas. 1141, the registered owner should be held as owner for the voyage.

The status of a master of a ship and of the owner do not bear the same relation.

It is claimed that the Panama Canal Zone court was without jurisdiction and that the sale of the vessel is void, that the master by timely appearance suggested to the court on behalf of the respondents an exemption from attachment under Act March 6, 1920, and that if the court had jurisdiction the contract of the libelants was merged in the decree. The first suggestion is immaterial here, and the second is material only in so far as the master is concerned.

[4] A decree in rem does not of itself defeat a contractual right to seek a remedy in personam for the balance of an unliquidated claim, if the two remedies exist and the remedy in rem has been exhausted. Toby v. Brown, 11 Ark. 308; Carey v. The Kitty, 5 Fed. Cas. 59; The Cerro Gordo (D. C.) 54 Fed. 391; Whitney v. Tibbol, 93 Fed. 686, 35 C. C. A. 544.

Under the shipping articles the master is obligated to pay the wages of the seamen. This is an extreme hardship, brought on by no fault of the master. It is a liability which was not contemplated by either the master or the seamen. The master lost his earnings on the voyage, he could not even participate in the proceeds of sale of the vessel, and now to be adjudged liable for the unpaid wages of the seamen will take from him all his savings, and the provision made for the education of his children, and leave his family destitute, except such exemptions as are given by law to the head of a family. The form of article is provided by section 4612, R. S., "Schedule" "Table A" (Comp. St. § 8392). This form was adopted when the relation of the master to the ship and to the owner was very different from that of the present time. The reasons for this stipulation, it would seem, do not obtain in the modern shipping world, and a change should be made, but it cannot be made by the court.

A judgment must be entered against the master for the unpaid wages and return transportation to Seattle for the officers and men, who returned immediately, as provided in the shipping articles:

"Railway tickets, sleeper tickets and $5 a day subsistence for time en route without stopover, mates, chief steward, chief engineer, three assistant engineers will be furnished first-class transportation and sleeper. Remainder of crew, tourist transportation and sleeper. * * *"

If the return was made by boat, the expense necessarily incurred, and the libel dismissed as to the United States and its agencies.