SKINNER (POTTS v.). See Case No. 11,-348.

SKINNER (UNITED STATES v.). See Case No. 16,309.

SKIPWITH (SHORT v.). See Case No. 12,-809.

S. K. KIRBY, The (UNITED STATES v.). See Case No. 16,310.

---

## Case No. 12,925.

### SKOLFIELD v. POTTER et al.

[2 Ware (Dav. 392) 394; 7 N. Y. Leg. Obs. 238; 12 Law Rep. 115; 7 West. Law J. 346; 2 Am. Law J. (N. S.) 385.] [2]

District Court, D. Maine. June 9, 1849.

SEAMEN—WAGES—CONTRACT BETWEEN OWNER AND MASTER—FREIGHT—CARGO.

1. When a vessel is let to the master, to be employed by him, and he to pay to the owners a certain portion of her earnings, the owners will be liable to the seamen for their wages, though by agreement the master is to have the entire control of the vessel, to victual and man

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Edward H. Daveis, Esq. 7 West. Law J. 346, contains only a partial report.]

her, and furnish supplies at his own expense; unless, at the time of shipping, this contract is made known to them, and they are informed that they are to look to the master as the only owner.

[Cited in Webb v. Peirce, Case No. 17,320; The Galloway C. Morris. Id. 5,204; The Horace E. Bell, Id. 6,702; The H. B. Foster, Id. 6,291; The Bowditch, Id. 1,717; The Montauk, Id. 9,717; The L. L. Lamb, 31 Fed. 33; Russell v. Rackett, 46 Fed. 201.]

[Cited in brief in Sims v. Howard, 40 Me. 277.]

2. The money, that is paid over by the master, is paid as freight, and the owners as receivers, and having an interest in the freight, are liable to the seamen for their wages.

[Cited in McCarty v. The City of New Bedford, 4 Fed. 829.]

3. The freight is hypothecated for the wages, and every part of the freight is liable for the whole wages. The owners, who have received freight under such a contract with the master, are liable for wages to the full amount of the freight in their hands, and not merely pro rata in proportion to what they have received.

[Cited in Poland v. The Spartan, Case No. 11,246.]

4. The merchandise is bound to the ship for the freight, and the freight to the seamen for their wages.

5. When the owners of the ship are also the owners of the cargo, the cargo owes freight to the ship, and this freight is pledged for the wages.

[Cited in Story v. Russell, 157 Mass. 157, 31 N. E. 754.]

6. The decision in the case Poland v. The Spartan [Case No. 11,246] reviewed and affirmed.

This was a libel in personam against the owners of the schooner Arrowsic, for seamen's wages. The libellant shipped at the port of Bath, as mate, on the 22d of September, 1848, on a general trading voyage, and continued on board, and did duty as mate of the vessel, in several voyages, two of which were to foreign ports, until the return of the vessel to Bath, on the second of May following. On his discharge, the master delivered to him a barrel of flour, part of the cargo belonging to the owners, and gave him an order on the owners for the balance of his wages due, amounting to $128, including the flour. The owners paid him $25 on the presentment of the order, and promised to pay him the residue in a few days. But after calling on them several times, and being put off from time to time, he sued out a libel. The owners, in their answer, not denying that the services have been rendered, set forth a defensive allegation, denying their liability for the wages. The defense relied upon is, that the vessel was let to the master on a verbal agreement; under which he was to have the use and control of the vessel, to employ her as he should choose, to victual and man her at his own charge, and to pay the owners for the use and charter of the vessel [one-half of her gross earnings, deducting] [2]

---

[2] [From 7 N. Y. Leg. Obs. 238.]

one-half of port charges. It was contended that having, by this contract, parted with the possession and control of the vessel, the master became owner for the voyage, or the term during which he employed her under this contract, and, as such, was exclusively liable for supplies and seamen's wages, and that they, as the general owners, were exempted from all liabilities for these charges.

J. M. Adams, for libellant.

P. Barnes, for respondents.

WARE, District Judge. It is admitted in this case, that the services have been performed, and that the wages are due. Some question was made on the evidence as to the balance that remains unpaid. Two charges of ten dollars each, made by the master for money advanced before the termina-tion of the service, are objected to by the libellant. To prove these, the master produced his memorandum book, in which these sums were charged; and this, with his suppletory oath, would be sufficient as prima facie evidence even if the suit were against the master himself. They stand charged in the same book, which contains all the other charges, which are not objected to, and which agree with the account kept by the libellant himself. They are the two last charges in the account; and, at the time of his discharge, the parties came to a settlement, and a draft or order was given, and accepted by the mate, for the balance found due. In this settlement these sums were allowed, and it appears without objection at the time. I see no objection to their allowance now.

The important question in the case is, however, whether the respondents are liable for the wages. The schooner was let by a parol contract, by which the master, as hirer, was to have the possession and control of the vessel, was to navigate, to victual, and to man her at his own charge, and employ her in such business as he should choose, and to render to the owners, for the use of the vessel, one-half of her earnings. It was objected at the argument, that it was not competent to a party to prove such a lease of a vessel by parol evidence, at least to affect the rights of third persons. It is true that by the general maritime law, it is held that the title to vessels must be shown by writing—[The Sisters, 5 C. Rob. Adm. 159] 3 Kent, Comm. 130—and the contract of letting and hiring also should regularly be, and usually is, proved by a charter-party in writing. But it has been held by a variety of decisions in this country, that such a parol lease is valid, not only between the parties, but to conclude the rights of third persons, who are strangers to it. It seems also to be settled by the general current of the decisions, that under a letting of the vessel herself, whether by a written charter or parol contract, when the

possession of the vessel is transferred to the hirer, and he appoints the master and crew, and sails her at his own expense, and has the entire control, that he is to be considered, with respect to third persons contracting with the master, as the owner, and that he succeeds to all the rights and liabilities of the owners. The general owners, or proprietors, have then no lien on the merchandise, for freight, nor are they personally liable for supplies furnished to the vessel on the contract of the master, but the hirer is substituted in their place, both as to their rights and liabilities. 3 Kent, Comm. 136; Conk. Jur. Law & Prac. Adm. 135. Nor does it make any difference, according to the decisions, though the charterer goes himself as master. Reeve v. Davis, 1 Adol. & E. 313. The cases in this country go further, and decide, when a vessel is taken by the master on the terms that this was, and he is to have the control, and direct the employment of her, and the earnings are to be divided between him and the owners, that this is to be considered as a lease or charter of the vessel. The master is held, under such an agreement, to be the special owner, and the general owners are not liable on his contracts for supplies furnished the vessels while thus employed. Taggard v. Loring, 16 Mass. 336; Emery v. Hersey, 4 Greenl. 407; Thompson v. Hamilton, 12 Pick. 425; Cutler v. Thurlo, 20 Me. 213; Thompson v. Snow, 4 Greenl. 264; Cutler v. Winsor, 6 Pick. 335.

But it is evident, when the owners put their vessel into the possession of the master on such terms, that the contract is of a mixed and somewhat ambiguous character. In one aspect, it may be considered as a charter of the vessel, and this as a mode adopted to determine the amount of the charter, or hire, to be paid. Viewed in another light, it partakes of the nature of a partnership, in which one partner furnishes the capital, and the other contributes his time and labor in the transaction of the business; and the profits to be divided. In a third view, it may be considered as a contract of hiring of the master, he to receive a share of the earnings of the vessel, instead of a certain and stipulated sum for his wages. In the various cases in which the subject has been brought before the courts for adjudication, it has been presented in these various lights; and without any great violation of legal analogies, or legal principles, the contract may be considered as belonging to one class or the other. In a case before Lord Ellenborough (Dry v. Boswell, 1 Camp. 329) the evidence, first offered, being that the owners and masters were to share equally in the profits, he declared that it was a partnership adventure, and that the master and owners were liable as copartners; a joint participation of profit and loss constituting a partnership; and when, on further evidence, it

appeared that the master was to have a share of the gross earnings, and not to be liable for losses, he pronounced it to be a contract of hiring of the master by the owners, and that this was only a mode of determining the amount of his wages. Generally, however, the courts have considered the contract as a charter of the vessel, and the master as owner for the voyage; and, as a corollary from this decision, it is held that the general owners are not liable for the master's contracts for supplies and repairs in the course of the voyage.

But though this is the general language of the authorities, there are exceptions. The case of Rich v. Coe, Cowp. 636, is a strong decision the other way. Lord Mansfield, in delivering the unanimous opinion of the court in that case, observed that whoever furnished supplies to a vessel, on a contract made by the master, has a three-fold security: 1. The person of the master. 2. The specific ship. 3. The personal liability of the owners; and, he added, that it makes no difference in the liability of the owners, that there is a private agreement between them and the master, by which he is to furnish the supplies and keep the ship in repair, unless the creditor has notice of the contract, and gives credit to the master individually.[3] The doctrine of Lord Mansfield seems to have been entirely satisfactory to Mr. Justice Story; for in his treatise on Agency (section 298), he states the law nearly in the words of this great master of maritime law, though the more recent decisions, which seem materially to qualify, if they do not directly overrule the doctrine, must have been quite familiar to his mind. Indeed, with respect to some of them, he has on other occasions not hesitated to express his doubts in very pointed terms. Arthur v. The Cassius [Case No. 564]; The Nathaniel Hooper [Id. 10,032]. And Chancellor Kent, though he seems to have yielded to the authority of the later decisions, expresses his own opinion in terms very nearly, if not entirely, agreeing with the doctrine of Lord Mansfield. "To whom was the credit given, seems to be the true ground on which the question ought to stand." 3 Comm. 135. Now, if this contract between the hirer and the owners is not known, the supplies are always furnished on the personal credit of the owners, as well as on that of the master. In the opinion, therefore, of Chancellor Kent, as well as of Judge Story and Lord Mansfield, although the owners have let the ship by a charter-party, under which the master, if he is their hirer, is bound to bear all the expenses of supplies, they ought to be held bound to third persons on the master's contracts, which fall within the scope of his ordinary authority as master, unless this private agreement is made known: for if it is not, supplies are always furnished

on the credit of the owners. The owners, by putting the master in possession of the vessel, hold him out to all who are ignorant of the special contract, or at least enable him to hold himself out, as authorized to bind them personally, by all contracts relating to the usual employment of the vessel. And, if any one must suffer from his acts, it is more reasonable that the loss should fall on them than on strangers, who have given him credit on the ground of his official character.

It is admitted, however, that the current of judicial decisions is in favor of exempting the owners from their liability for ordinary supplies, while the vessel is employed under such a contract. But no decision has yet gone so far as to relieve them from their liability for seamen's wages. Curt. Merch. Seam. p. 336. The seamen have always this triple security, besides a direct hypothecary interest in the freight; and in all ages of the maritime law, their claim for wages has been highly favored, both on the ground of general commercial policy, and from the consideration of their own habits of carelessness and characteristic improvidence. They habitually enter into their engagements in reliance on these securities, and they ought not, on principles of public policy and natural justice, to be deprived of them by any refined and subtle distinctions of law, which are so alien from all their habits of thought and action.

This form of contract, of letting vessels to the master, to be employed on shares, has become very common in this part of the country, especially with respect to small vessels employed in the coasting trade. The master to whom the vessel is intrusted by the owners, is usually an enterprising and industrious young man, but ordinarily of limited pecuniary responsibility; or as soon as he acquires sufficient capital or credit, he becomes a part owner himself. These contracts are almost invariably by parol, and the terms are settled by a well-understood usage. The master, under the usage, is to bear the whole expense of victualing and managing her. The port charges in the various ports visited, are first to be paid from the gross earnings of the vessel, and the balance of the freight is to be divided in equal shares between the master and owners. The seamen often, and perhaps usually, have no knowledge of this private contract between the master and owners, and they engage their services in reliance upon the ordinary security, which the general marine law gives them. If this mode of letting the ship to the master, to be employed on shares, relieves the owners from their liability for wages, the contract will operate on the seamen, probably in a great majority of instances, as a perfect surprise. After the termination of his service, he finds one part, and an important part, of his security, the personal liability of the owner, is gone, under a private contract unknown to him; and that of the master may be, and often will be, worthless. There remain, it is true, the freight and

---

[3] In the case of Reeve v. Davis, 1 Adol. & E. 312, which seems directly to overrule this decision, the case itself was not referred to, either by the counsel or the court.

the vessel, but the freight is received from time to time, and there may be, and usually is, little remaining due at the end of his service. The ship is, indeed, an ample security. But since the act of March 3, 1847, c. 55 [9 Stat. 181]. respecting costs in admiralty proceedings in rem, by which all costs are denied to the libellant. except for the payment of witnesses, unless he recovers more than one hundred dollars, the remedy against the vessel, for all useful purposes, is taken away, when the suit is for less than the sum named. And in these coasting and trading voyages, the balance of wages will rarely amount to so much as one hundred dollars. The consequence will be. that practically the seamen will have for their security nothing beyond the personal liability of the master. No judicial decision has yet extended this modern doctrine so as to deprive the seamen of their ancient right of recourse against the owners. The whole doctrine. in the cases to which it has been applied. is not free from difficulties on the principles of our law, except with the limitation mentioned by Lord Mansfield. that the creditor is notified of the non-liability of the owners at the time the credit is given. Because when he contracts with the master, he always has a right to believe that he is contracting with the owners, if he is not advised to the contrary. If he is informed, and then gives credit, he knows to what security he trusts. To extend the principle so as to bar the right of the seamen, would be repugnant to the general spirit of the maritime law, which has studiously provided in their favor the greatest security for their wages. I am unwilling to be the first judge to give it that extension. Indeed, the original doctrine of Lord Mansfield appears to me to be the most just. and most in harmony with the general principles of our law. The master, by the known rules of law, represents the owners as their agent, and is authorized to bind them by all contracts relating to the usual employment of the ship. The seamen enter into their engagements with the full confidence that the owners are bound for their wages. If it must be admitted that the decision of Lord Mansfield is overruled by the later decisions. these go no further than to exempt the owners from their liability for supplies, furnished by men who are in the habit of looking well to their securities. Rather than extend these decisions by analogy to the claims of the crew, unless I can clearly see that on principle the owners are exonerated, I am ready to say, "Malo cum Platone errare," —I will not add, "quam cum cæteris vera sentire," but,—sooner than follow the analogies of decisions, the soundness of which is so questionable, and carry them out, to the exclusion of the seamen from their recourse against the owners, unless, at the time of their engagement, they are plainly told that they are to look to the master as the only owner. The concealment of a fact of such importance, is a fraud on the men.

But I do not put the decision of the case on this ground alone. There is another, on which I think the owners are bound for the wages. By the ancient maritime law, the title of seamen to wages is made to depend on the issue of the adventure for which they are engaged. Unlike other contracts of hiring, their right to compensation does not depend alone on the fidelity and skill with which they perform the services for which they engage; but with whatever perseverance and courage they exert themselves, their right to compensation is suspended on contingencies, which may affect the ultimate result of the voyage; it is made dependent on what has been termed the fortune of the vessel. What. then, is this fortune to which the seamen must look? The ship, says Emerigon, in the condition in which she was at the time of her departure from the port of outfit, together with all the freight which is gained in the course of the voyage, form that fortune of the vessel, which constitutes the pledge to the seamen for their wages. Trait Des Assurances, c. 17, § 11. The privileged hypothecation, then, he adds, allowed to the mariners, comprehends every part of the ship, and every part of the freight, according to the nature of hypothecation, which is tota et in toto,—tota in qualibet parte. Their privileged lien is entire over the whole, and is entire in every part. The ship and the freight, with respect to wages, form one mass, and all that remains of either, at the end of the voyage, is pledged for their payment. The contract of the mariners, Emerigon goes on to say, is a species of copartnership. It is not indeed a partnership as to all the effects of that contract, but as to some of its consequences; for the seamen have no claim to a remuneration, but to the extent of the effects embarked in the enterprise, which they bring home. If all is lost, the mariners lose their wages, and they cannot then enforce the payent, by a personal action against the master or owners. But if all is not lost, whatever remains of the ship or freight, is specifically pledged for their payment. Freight earned and put ashore is saved from the effect of a supervening shipwreck, by which all that remains is lost. It is a partnership fund, that has entered the common chest, and is hypothecated to the seamen for their wages.

It is now more than twenty years since I was first called upon to examine this right of the seamen, to claim their wages out of the earnings of the vessel. It was in the very ably contested case of Poland v. The Spartan [Case No. 11,246]. In that case, it was held, that when goods of the owners themselves are shipped, they owed freight to the vessel; and though no stipulated freight could be agreed, that the seamen could proceed against the goods in specie. to enforce their rights to the amount of a reasonable freight, to be determined boni viri arbitrio. I am not ignorant that the doctrine was then considered, by some of the profession, as somewhat startling, for its supposed novelty and boldness. But

after ample time to review and reconsider the subject, I have seen no reason to retract or qualify the doctrine of that case. It is, in my judgment, a just and logical deduction from the peculiar character given by the law to the seamen's contract; and is supported by the highest authority in the maritime law. The owners, says Emerigon, who are shippers in their own vessel, have two qualities which ought not to be confounded. In quality of shippers, they owe a freight to the ship herself; and in their quality of owners, the ship owes a freight to them; and he adds, this freight is pledged to the crew. Des Assurances, c. 17, § 11, No. 2. It constitutes a part of that fortune of the vessel to which the crew are to look for their pay. To them, it makes no difference who owns the cargo. So far as they are interested, there is a freight earned, and, to the amount of their wages, it belongs to them.

I am aware of the dictum in the case of Sheppard v. Taylor, 5 Pet. [30 U. S.] 712, that "the cargo is not in any manner hypothecated or subjected to the claim of wages." This was but a dictum, and the point was not necessarily involved in the cause. It may be true that the cargo is not directly, but it certainly is indirectly bound for the wages. For it is a first principle of the maritime law, that the cargo is bound to the vessel for the freight, and another equally ancient and undoubted, that the freight is pledged for the wages. Indirectly, therefore, to the amount of the freight due upon it, the cargo is bound for the wages. The master is not obliged to deliver it until the freight is paid or secured, and if not paid, he may sell so much as is necessary to pay the freight. The seamen may, therefore, indirectly, through the master, proceed against the cargo itself, for their wages to the amount of the freight due. When the owners of the ship are the owners of the cargo, the seamen's claim on the freight can be enforced in no other manner but through the merchandise; and I see no objection in principle or convenience, to allowing the seamen to do that directly in their own name, which they may do indirectly through that of the master. Such was evidently the opinion of the English court of admiralty, in the case of The Lady Durham, 3 Hagg. Adm. 196. The court says that "a mariner has no lien on the cargo, as cargo. His lien is on the ship, and on the freight as appurtenant to the ship; and so far as the cargo is subject to freight, he may attach it, as a security for the freight that may be due." The doctrine maintained in the case of The Spartan seems also to have met the approbation of Judge Conklin. In his learned and valuable treatise on the Law and Practice of the Admiralty (pages 75, 76), he says that "it is recommended by persuasive considerations of justice, and supported by strong analogies in the undisputed principles of the maritime law."

It appears by the testimony of the master, who was examined as a witness in the case

for the respondents, that he has paid over to them, at different times, $600, and that on a cargo of lumber carried for them the freight was $500, which has not been paid to him, but remains as a part of the earnings of the vessel in their hands. In addition to this, the freight, on the cargo brought home in the vessel on her return to Bath, was received and collected by one of the owners, and is now in their hands. Now every dollar of this money was hypothecated to the seamen, as soon as it was earned, for their wages. To the amount due to them, it was their own hard earnings, and whoever received it as freight, received it subject to their claims. As the freight, says Emerigon, is the fruit of the vessel, it is just that it should first be appropriated to pay the wages of those whose labor has produced it. This designation of freight is derived from the nature of things, while their privilege against the vessel is against common right. Assurances, c. 17, § 11, No. 3. It is true, that when the master pays to a creditor the money which he receives as freight, the seamen cannot follow it into the hands of such creditor. For it does not pass into his hands carrying with it the quality of freight. But to the owners, in this case, it is paid over as part of the earnings of the vessel, that is, as freight. It is said, indeed, that is paid to them, not as freight, but as charter for the hire of the vessel. But even admitting, under this contract of hiring on shares, that the master is to be considered as the special owner, that the general owners, as to contracts made by him with the seamen, as well as for supplies, are strangers to the vessel, and that these payments, made to them, are to be held as payments of charter, and not as payment of part of the freight, there will still remain in their hands all the freight earned on her return voyage to Bath, and $500 which they owe on the cargo of lumber. To this amount they have the earnings of the vessel in their hands, and the seamen might, in a suit against the master, have attached this as freight due.

It is said, if the owners are held liable for the wages on the ground that they have received freight, that they are liable only in the proportion which the amount they have in their possession bears to the whole amount earned. But if the decision were to be put on this ground alone, the consequence would not follow. The whole freight is hypothecated for the whole wages. And from the nature of the creditor's interest in the thing pledged, it is not subject to this division. Every part of the thing is pledged for every part of the debt, "propter indivisam pignoris causam." Dig. 11, 2, 65. And, therefore, if two things are pledged for one debt, and one chance to be lost or destroyed, the hypothecation or lien continues entire for the whole debt in that which remains. Domat, Lois Civiles, lib. 3, tit. 1, § 1, No. 13; Pothier, De L'Hypotheque, c. 3, 1; Pitman v. Hooper [Case No. 11,185]. But it seems to me, that the decision may more properly be put on a

broader ground. Where the owners put their vessel into the hands of a master, to be employed by him on shares, I am prepared to hold as a just deduction from the principles and general policy of the maritime law, that they will continue liable to the seamen for their wages, notwithstanding the entire control of the vessel may be surrendered to the master, unless the seamen, at the time of their engagement, are notified that the master is to be considered as the sole owner, and that they are not to be liable. The rights of the seamen ought not to be affected by this private agreement between the master and owners. Even if the doctrine of the modern decisions is admitted, and the owners are held not liable to merchants who furnish supplies, there are strong objections to extending the principle to the contracts of seamen. They enter into their engagements, in the confidence that they have the usual and legal securities for their wages. One of these, to which a seaman habitually looks, is the personal liability of the owners. But in this case, there will be in fact no owner, and the only personal security they have is that of the master. Another reason is, the freight, which is paid to the master, is the proper fund for the payment of the wages. In the hands of the master, the whole of it is liable for them. But here the freight is, from time to time, paid over for the hire of the vessel, and only one-half of it remains in his hands, at the close of their service, to respond for their claims. This private agreement, between the owners and master, operates as a perfect surprise upon them. My opinion is, that they ought to be held as owners. And further, in my judgment, they are liable for the wages as receivers of the freight. They have in their hands, according to the evidence, $1100 of the earnings of the vessel, besides all the freight received on the cargo she brought home to Bath. The money that was paid over to them was, by the very terms of their contract, paid as the ship's earnings, that is, as freight. In its quality of freight, it is liable for wages, in whosesoever hands it may be. It partakes too much of the character of subtlety, to call it charter, or the hire of the vessel. It is more consistent with justice, and I think quite as much so with the analogies of the law, to leave to it the name which the parties themselves have given it, and under that name the seamen have a right to receive their pay from it. If, indeed, the respondents were to be held liable simply as receivers of the freight, it might be necessary to amend the libel, by making the master a party, and then the services on them would operate as an attachment of the freight in their hands; and if I thought it necessary, I should not hesitate to allow an amendment to meet this posture of the case; but in my opinion it is not.

Independent of all these considerations, my opinion is that the respondents are liable on their express promise. When the libellant presented the order of the master, a part of it was paid, and a promise given to pay the residue. The libellant had a right to consider this as a distinct admission of their liability. If this order was to be considered as a piece of commercial paper, and the principles of the commercial law to be applied to it, they would be liable upon it as acceptors. For an acceptance may be by parol, or may be inferred from the conduct and acts of the party. Story, Bills Exch. § 243. In reliance on this promise, the libellant forebore to commence proceedings against the vessel, or the master. It is now too late for the owners to deny their liability. In every point of view, I think the libellant entitled to a decree for his wages.

Wages decreed, $103.12.