DU BRUL (MILLER & PETERS MANUF'G CO. v.). See Case No. 9,597.

DUBUCLET (LOUISIANA ex rel. MONCURE v.). See Case No. 8,538.

---

## Case No. 4,110.

### The DUBUQUE.

[2 Abb. U. S. 20;[1] 2 Chi. Leg. News, 381.]

District Court, E. D. Michigan. June Term, 1870.

REGISTRY OF VESSELS—STALE DEMANDS.

1. A master has no lien upon the vessel for his wages.

2. Under the laws of the United States governing the registry of vessels, the person in whose name, as master, a vessel is registered, must be deemed her master for every legal intendment and purpose.

3. Where there is a master de jure by virtue of the registry, there cannot be, in contemplation of law, another master de facto. Another person employed by the owners to navigate and even to discipline the ship. does not become master in either sense. The relation of master is fixed by the registry.

[Cited in Peterson v. The Nellie and Annie, 37 Fed. 21.]

4. An alien cannot, under the laws of the United States governing the registry of vessels, be deemed master of a vessel, even for the purpose of defeating his claim to a lien for wages.

5. An indorser upon a note not yet matured, gave a mortgage upon a vessel to secure his contingent liability. Afterwards, the liability became fixed. The mortgage, however, entitled him to an extension of time for payment. *Held,* that the mortgagee was to be deemed a mortgagee for a valuable consideration, and entitled, as such, to intervene for the protection of his interest,[2] in a libel filed against the ves-

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]
[2] [See The Old Concord, Case No. 10,482, which was published in 2 Abb. U. S. 20, as a note to The Dubuque.]

sel to recover wages. Either the extension of time for payment of the debt, or the waiver by the holder of the note of the right to sue the indorser, and in such suit to attach the vessel, constituted a sufficient consideration for this purpose.

6. In respect to the question what delay to enforce a maritime lien will warrant its being postponed to subsequent liens acquired without notice, the same rule applies to claims for wages, as to claims for repairs and supplies.

[Cited in The Bristol, 11 Fed. 163.]

7. The general rule is, that a delay to enforce a maritime lien, after a reasonable opportunity to do so. is deemed a waiver of the lien as against subsequent purchasers or incumbrancers in good faith and without notice, unless such delay is satisfactorily explained.

[Cited in The Detroit, Case No. 3,832; The Harriet Ann, Id. 6,101; The Hercules. Id. 6,400; The Virginia Rulon, Id. 16,974. Followed in The Lauretta, 9 Fed. 624.]

[8. Cited in The J. W. Tucker, 20 Fed. 134, to the point that in respect to liens arising in the course of navigation on the western lakes and rivers, where the voyages are short and frequent, the rule has been adopted, to a considerable extent, of making the division of claims by the successive open seasons of navigation. instead of by the separate voyages during each season.]

This was a libel in rem for wages of libelant as pilot and sailing-master of the propeller Dubuque, from April 5 to December 5, 1865, at one hundred and twenty-five dollars per month. The libelant claimed a balance due and unpaid of seven hundred and forty-nine dollars and fifty-three cents. The libel was filed and the vessel seized, February 13, 1869. The answer of the Second National Bank, claimant, intervening for its interests in the proceeds of the vessel, as mortgagee, denied knowledge, &c., of the alleged services of libelant, and denied that there was any thing due him, or that any thing which might be due was a lien upon the propeller or her proceeds. The answer further alleged on information and belief: That libelant was in fact master of the propeller, and therefore could have no lien for his wages. That soon after libelant left the vessel, and on December 8, 1865, he had a settlement with the owner, and received the owner's note in full for the balance due him for wages, and for another small claim he held against the owner, and in full for his claim against the vessel, if any existed. That on October 4. 1866, John Hutchings, sole owner of said vessel. mortgaged the same to claimant for eleven thousand four hundred and sixty-two dollars and fifty-two cents; that the mortgage was duly recorded on October 10, 1866, and there was due and unpaid upon the mortgage at the time of filing the answer the sum of nine thousand two hundred and fifty dollars; that this mortgage was given for a valuable consideration, and without notice of libelant's claim; and that the libelant's claim is stale, and ought not to be enforced as against the mortgage.

Moore & Griffin, for libelant.
Newberry, Pond & Brown, for intervenor.

LONGYEAR, District Judge. The allegations of the libel as to the fact and period of service of libelant, and as to the rate of wages, are fully sustained by the proofs, and are not contested. The questions which are contested, and upon which the decision of the case must turn, will be taken up and disposed of in the order in which they are raised by the answer.

The first question presented is that raised by the allegation in the answer, that libelant was in fact master of the propeller, and, therefore, could have no lien for his wages. The libel alleges that one George Moir was master, and the proof shows that the propeller was enrolled and licensed in his name as such. Moir, then, was the registered master, or master de jure of the vessel, and he remained such during the entire term of service for which wages are claimed by libelant. But it is contended on behalf of respondent that libelant was in fact employed, and that he actually served as master, and, therefore, was master de facto, and that the vessel was registered in the name of Moir as master as mere matter of form, for the reason that libelant was then an alien, and could not be registered as master under the navigation laws. See act of December 31, 1792, (1 Stat. 289, § 4).

There was some evidence adduced tending to prove the above state of facts, which will be considered hereafter. It is a well settled rule of the maritime law that the master has no lien upon the vessel for his wages. He must look to the personal responsibility of the owner alone. See 2 Pars. Mar. Law, 582; 2 Pars. Shipp. & Adm. 182. and the numerous cases there cited. It is essential, therefore, to ascertain and determine in the outset, who was master. I shall consider this question, first, as one of law, and second, as one of fact.

In the absence of the registry laws, or in a case in which the registry laws have not been resorted to, there can be no doubt he would be master to whom the owner actually entrusted the navigation and discipline of the vessel. But how is it when, as in this case, the registry laws have been resorted to?

The registry laws have for their object, among other things, the building up and fostering a commerce purely American. With this object in view, great importance is manifestly attached, and justly so, to the provision in regard to the designation of the master, and his political status. The owner is required to make oath who is master, and that he is a citizen of the United States. And this last requirement is deemed of so much importance that it is further required that if the master is within the district at the time of application for registry. he shall himself make oath to his citizenship. And in case

the facts so required to be sworn to are not as stated, the severe penalty is imposed, in case of the owner thus swearing falsely, of a forfeiture of the vessel, together with her tackle, furniture, and apparel; and in case of the master, of the sum of one thousand dollars.

The master is also required to join with the owner in a certain bond before registry can be obtained. In case of a change of such master, such change must be reported, and a corresponding change in the registry made, under the penalty, in case of neglect, of the registry previously made being made void, and of the payment of the sum of one hundred dollars by such new master.

In view of the importance thus attached by the law to the office of master, the registry certainly ought not to be treated lightly, as evidence of who is master. I think far the safer and more satisfactory rule is to hold that in case of resort to the registry laws, all the incidents of those laws attach, and that the relations required by the law to exist between the owner and the master, and between the master and the vessel, and between the master and the crew become fixed by the registry, and any other arrangements the owner may make for the actual discharge of the duties of master are entirely subject to the relations so fixed, until they are changed in the manner prescribed by the registry laws; and that so long as the person in whose name, as master, the vessel is registered, continues to be master by the registry, he is such to all intents and purposes in the eye of the law.

In the case of Draper v. Commercial Ins. Co., 21 N. Y. 378, cited by respondent's counsel, the question was as to the seaworthiness of the vessel, as affecting the contract of insurance. It was there held that, as affecting that question, it made no difference if the person holding the papers as master was entirely incompetent to sail and discipline the vessel, provided the navigation and discipline of the vessel were intrusted in fact to a competent sailing-master; and that, although the registry is prima facie evidence as to who is master, yet it is not conclusive, as affecting the question of seaworthiness. Anything decided in the case beyond this is mere dictum, and not authority.

But I regard the doctrine upon which the decision is based as unsound, and if it was of binding authority upon this court (which of course it is not), I should not be inclined to extend its application one iota beyond the exact point decided. I consider the argument of the dissenting opinion of Judge Comstock in that case, even as to the point decided, sound, and, as it seems to me, conclusive. The dissenting opinion holds that the nature of the service admits of but one supreme authority, and the laws recognize but one; and that that authority is vested alone in him in whose name the vessel is registered as master, in virtue of his office; and in that opinion I fully concur.

Any other position opens the door wide to frauds upon the law, and at once renders the law of no force or effect whatever. If one person may be entered as master for the purpose of registry, and another be master in fact, whether a citizen or not, and without having executed the required bond, then the law may be violated with impunity, and the sooner it is taken from the statute book the better.

But it is said that Moir was incompetent in point of skill to navigate the vessel. That is a matter entirely between him and the owner, and between the owner and those who might have suffered on account of his incompetency. The only qualification required by the act is, that he shall be a citizen of the United States. He was such citizen. He was made and recognized as master by the registry, and however incompetent he may have been to navigate the vessel, the entire crew, including libelant himself, were, in contemplation of law, subject to his orders.

It is further claimed that libelant actually discharged the duties of master. Concede that he did, still he did not possess the powers of master, such as the power to bind the vessel by his contracts, the power to inflict punishment for disobedience to orders, &c. These powers had been expressly conferred upon another, the person holding the papers as master, by law. See U. S. v. Taylor [Case No. 16,442].

Libelant's assumption of such powers would have been unlawful usurpation, and punishable as such under section 1 of the act of March 3, 1835 (4 Stat. 775). He was also capable of revolt under section 2 of said act. See U. S. v. Winn [Case No. 16,740]. And he could not be punished as master for inflicting cruel and unusual punishments, &c., under section 3 of said act.

In the cases cited by respondent's counsel, holding that where the mate had succeeded to be master by the death of the master, he could not receive extra compensation as master on a libel in rem, but could recover as mate, there was no master. The duties and powers of master devolved upon the mate, it is true, but it was ex officio merely, and because he was mate. He did not cease to be mate when he was acting as master. In other words, he acted in a double capacity, in one of which, that of mate, he had a lien, and in the other, that of master, he had not. These cases decide simply this, that so far as libelant acted as mate, he had a lien, but so far as his claim was increased by his service as master, he had no lien.

As applied to the present case, these cases would sustain the following proposition: that so far as libelant acted as pilot and sailing master, he has a lien for his wages, but if any portion of his claim is for services as master, to that extent he has no lien. But inasmuch as the vessel had a master, the duties of master could not have devolved upon him, as they did upon the mates in the cases cited; and

therefore the cases cited have no application to the present case.

In the case of L'Arina v. The Exchange [Case No. 8,088], cited by respondent's counsel, the ship had a real master, who of his own motion, acting in his capacity as master, hired a man at Havana to lend his name, to be used as nominal master to clear the vessel at that place, and to proceed to Charleston and back to Havana. It was there held that the person so hired never was master, and that therefore he had a lien for his wages. The real master had no authority thus to divest himself of his office and confer it upon another. This could be done by the owners only. Neither are we advised, and it is not material, what was the effect of the transaction at Havana, under the laws there in force. The effect of the registry under our registry laws is alone under consideration in this case.

I hold, therefore, that the person in whose name the vessel is registered as master, is master for every legal intendment and purpose. That where there is a master de jure by virtue of the registry, there can be no master de facto in legal contemplation. That the law recognizes in this respect but one supreme authority, and therefore, if another person than the registered master is employed by the owners to navigate and even discipline the vessel, he does not thereby become master either de facto or de jure. That the relations between master and crew, as they exist by the maritime law and the acts of congress, become fixed by the registry, and cannot be changed by any such interference.

There is, however, another complete answer to the objection of respondent, that libelant was master in fact. He was an alien, and was therefore prohibited by the registry laws from being master de jure. It would be against public policy, and aiding in the perpetration of the grossest of frauds upon the law, to hold that he could be master de facto. As a question of law, therefore, the defense set up that libelant was master in fact, is not well founded.

I should be obliged to hold also, that this defense is not sustained as a question of fact. This is set up by the answer as matter of substantive defense, and must be maintained by respondent by a preponderance of proof. Hutchings, the owner, swears that he employed libelant as master, but that being an alien he could not be registered as master, and therefore it was arranged between him and libelant that the registry should be in the name of Moir (who was in fact engineer of the vessel), as mere matter of form.

Libelant testifies that he was employed expressly as pilot and sailing master, and that not a word was said about his taking or not taking the registry in his name as master, and that there was no arrangement or understanding to that effect. The proof shows that in the discharge of his duties on board the vessel he did and assumed nothing more, with one or two unimportant exceptions, than what would be required of him acting in the capacity of pilot and sailing master.

Libelant and Hutchings stand on an equal footing as to interest and credibility, and neither is corroborated; and partly in consideration of the apparent fact that Hutchings must have sworn falsely when he swore that Moir was master of his vessel for the purposes of registry, or that he has sworn falsely in this suit, I hold that the evidence preponderates in favor of libelant's position, and that this defense is not made out in point of fact. Libelant therefore has a lien upon the vessel for his wages, and is entitled to recover in this suit the balance due him, unless the remaining defenses set up, or some one of them, is made out.

The next defense set up is that soon after libelant's term of service had closed, and on the 8th day of December, 1865, he had a settlement with the owner, and received the owner's note in full for balance due him for wages, and for another small claim he had against the owner, and in full for his claims against the vessel. The rule of law upon this point is that the lien is not waived by simply taking a note, unless it is distinctly so understood. See The St. Lawrence, 1 Black [66 U. S.] 522, 531, 532; Carter v. The Byzantium [Case No. 2,473]; Sutton v. The Albatross [Id. 13,645]; Moore v. Newbury [Id. 9,772].

The proof shows that a settlement was had and a note taken for balance due him at the time stated in the answer; but there is no proof whatever that it was understood that libelant's lien upon the vessel was thereby waived. This defense is therefore unsupported. I shall, however, notice this matter again in connection with the remaining branches of the case.

The next and remaining defense set up is, that on the 4th day of October, 1866, the vessel was duly mortgaged to claimant for a valuable consideration, and without notice of libelant's claim, and claiming that libelant's claim is stale, and ought not to be enforced as against the said mortgage.

The proofs fully sustain the allegations of the answer as to the giving of the mortgage, and want of notice of libelant's claim. As to the consideration, the proof shows that the mortgage was given by John Hutchings, sole owner of the vessel, to secure a previous indebtedness from him to the mortgagees of eleven thousand four hundred and sixty-two dollars and fifty-two cents, of which there remained due and unpaid at the time of filing the answer, the sum of nine thousand two hundred and fifty dollars. That the indebtedness of Hutchings grew out of indorsements of paper held by the bank. That the particular notes representing the amount for which the mortgage was given, were renewals of former notes, upon which Hutchings had in like manner been indorser. That these notes for which the mortgage was given did not fall due until October 26, 1866, and, therefore, Hutchings'

liability had not become fixed at the time (October 4, 1866) the mortgage was given; but it does appear that his liability did afterwards become permanently fixed upon those notes.

On this state of facts the learned counsel for libelant contends: 1. That there was no consideration for the mortgage at the time it was given, as there was then no liability on the part of Hutchings to pay the debt. 2. That even if his contingent liability, having grown, as it did, into a fixed liability, constituted a sufficient consideration as between the parties, it is not a valuable consideration in the eye of the law so as to enable the mortgagee to set up his lien as against the lien of libelant.

1. As Hutchings' liability was contingent only at the time the mortgage was given, the security of the mortgage was, of course, also contingent; but when Hutchings' liability became fixed and absolute, then the security of the mortgage also became fixed and absolute. The mortgage was, therefore, good and valid, as between the parties, from and after the maturity of the notes, October 26, 1866, if not before.

2. The debt to secure which the mortgage was given fell due October 26, 1866, and Hutchings' liability to be sued upon it accrued at that time.

By the terms of the mortgage, the time of payment was extended, in all, to November 25, 1868, with provision for further extension. It is to be presumed that this forbearance would not have been given except upon the giving the mortgage security. This, of itself, constituted a valid consideration for the mortgage, and, it is fair to presume, was the principal motive of Hutchings in giving it.

Again. If the mortgage had not been given, and the time extended, the bank could have sued Hutchings upon the debt, and attached the vessel, or seized the same in execution. And a lien thus obtained has been recognized by high authority as sufficient to entitle the attaching creditor to intervene and contest a previous lien on the ground of laches. See Blaine v. The Charles Carter, 4 Cranch [8 U. S.] 328; Packard v. The Louisa [Case No. 10,652]. There can be no sound reason why a lien voluntarily given for the same debt, should not be equally effectual.

It expressly appears in the proofs, that the mortgage was taken by the bank without any notice whatever of libelant's claim. I hold, therefore, that the intervenor in this case is a bona fide mortgagee for a valuable consideration, and, as such, is entitled to intervene and contest the priority of libelant's lien.

It remains, therefore, to consider and determine the question of laches on the part of libelant in bringing forward and enforcing his lien. In determining this question, the same rules apply to liens for wages as to liens for repairs and supplies. Notes to Abb. Shipp. 539; Leland v. The Medora [Case No. 8,237]; Stillman v. The Buckeye State [Id. 13,445].

In the case of seagoing vessels, it seems to be pretty well settled that such liens will in no case be extended beyond the next voyage if they are unknown to the public, and new interests of third persons as to the vessel intervene without notice. This, however, can hardly be applied strictly to vessels navigating the lakes, where numerous voyages are made during each season, no one voyage occupying more than two or three weeks. But the principle is the same, viz: that such liens should not be enforced to the injury of parties who have acquired subsequent rights and interests in the vessel without notice, where there has been unreasonable delay in enforcing the lien; and it has been held in this district, by my honored predecessor, that, as a general rule, there is great reason to limit these tacit liens to the season of navigation, and not to extend them beyond one year, as applied to the navigation of the lakes. See Stillman v. The Buckeye State [supra].

No fixed rule, however, can be laid down upon the subject. What will constitute unreasonable delay, must depend upon the circumstances of each particular case. While liens for seamen's wages are the most favored in the admiralty, the policy of the law is that they should not be protracted beyond a reasonable opportunity for their enforcement, to the injury of third parties acquiring subsequent liens without notice.

Perhaps the safest and most satisfactory general rule to be adopted, deduced from the authorities, and from the nature of the subject, would be that a delay to enforce a maritime lien after a reasonable opportunity to do so, shall be taken and deemed as a waiver of the same as against subsequent purchasers or incumbrancers in good faith, without notice, unless such delay is satisfactorily explained. See Packard v. The Louisa [supra]; Blaine v. The Charles Carter, 4 Cranch [8 U. S.] 328; The Utility [Case No. 16,806]; The Lillie Mills [Id. 8,352]; The Chusan [Id. 2,717]; Stillman v. The Buckeye State [supra].

In this case the service on account of which the lien is claimed, ended December 5, 1865, and the libel was filed February 13, 1869, three seasons of navigation having fully passed. In the mean time, about three days after the service ended, libelant had a settlement with the owner concerning his wages and another matter, and agreed upon a general balance due him, and received a part of the same in money, and the owner's note for the remainder. Nothing more was done by libelant until nearly the close of the next season's navigation, when the intervenors acquired their lien upon the vessel without notice of any claim on the part of libelant; and in this precise shape matters remained

for upwards of two years and four months longer, before any attempt whatever was made on the part of libelant to enforce his lien. During all this time the vessel was engaged in navigation upon the lakes, and where she might have been seized; and no explanation of the delay is attempted or offered.

It is difficult to conceive of an array of facts affording a stronger or more conclusive presumption that libelant had waived his lien, and looked to the owner alone for payment. The settlement and taking of the note is mentioned in this connection because, although not evidence of an express waiver of lien, it is an important link in the chain of circumstances going to prove a presumptive waiver. The rights of the owner are not now under consideration, and the presumptive waiver of lien by libelant is held to apply only as against the mortgage lien of the intervenors. Therefore, if libelant desires to continue his suit as against the owner, a decree must be entered postponing his lien to the mortgage lien of the intervenors, and that such mortgage lien be first paid to the intervenors, together with their costs of suit to be taxed, out of the proceeds of the sale of the vessel. Otherwise, the libel must be dismissed, with costs to intervenors. Decree accordingly.