### THE NEBRASKA.

### In re PRINGLE.

(Circuit Court of Appeals, Seventh Circuit. January 14, 1895.)

#### No. 200.

1. MARITIME LIENS—MASTER'S WAGES.
    Upon the Great Lakes, as upon the high seas, the master, for reasons of public policy, is not entitled to any lien for his wages. This rule is not affected by the fact that the owners have appointed a purser, who is the financial officer of the ship, and has the custody of the freight money.

2. SALVAGE—SERVICES BY MASTER—VESSEL IN CUSTODY.
    The arrest and detention of a vessel in a civil suit does not work an abandonment of her, so as to entitle the master to salvage compensation for services rendered, saving her from damage by storm while in the marshal's custody. It is the master's duty to remain with the ship, notwithstanding her arrest, and any services he may render are in the performance of his legal duties.

Appeal from the District Court of the United States for the Northern District of Illinois.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

JENKINS, Circuit Judge. The steamer Nebraska, engaged in the business of commerce and navigation between ports and places in different states of the United States upon the Great Lakes and navigable waters connecting such lakes, was arrested at the port of Chicago on the 3d day of July, 1893, upon a libel filed in the court below by one Frank Hoffman, for supplies furnished the vessel. Under decree of the court the steamer was sold September 19, 1893, and the proceeds covered into the registry of the court, the amount being insufficient to discharge in full the various claims filed against the vessel. See 61 Fed. 514; 17 C. C. A. 94, 69 Fed. 1009. Subsequently the appellant filed an intervening libel, wherein it was asserted that he was master of the vessel, and "was hired by the owners to sail said boat during the season of 1893, but that they became indebted, and she was seized thereafter, and unable to sail for several months." The testimony of the intervener discloses that he was hired for the sum of $1,200 for the season of eight months from April 26, 1893, being at the rate of $150 a month. He remained on board the vessel after the seizure and until the sale of the vessel on the 19th of September, 1893. His intervening libel was filed to recover out of the fund in court, for his services as master, the sum of $602.60. It is left uncertain for what period of time this sum is demanded, or what amount, if any, had been paid him by the owners upon account of his services. His claim was disallowed by the court below on October 10, 1893. A rehearing was granted June 18, 1894, and the appellant allowed to amend his intervening libel by asserting a claim for salvage services rendered under the following circumstances: While the steamer was in the custody of the marshal, and lying at a dock in the basin at the entrance of the port of Chicago, during the night of the 28th of August, 1893, the steamer being made fast by five small lines, a gale of wind from the northward sprang up, causing three of the lines to part: the others were in peril of parting, endangering the safety of the vessel. In the emergency the appellant notified the marshal's custodian of the danger, and with his aid got out a 10-inch hawser, and therewith made the vessel fast, so that, notwithstanding the parting of the two remaining small lines, the vessel rode out the gale in safety. He asked to be awarded the sum of $500 as for salvage services. On June 18, 1894, upon the rehearing, the court dismissed the petition and libel and the amended libel, which decree the appellant brings here for review.

1. In this country it is the law of the admiralty that the master has no lien upon the vessel for his services. The Orleans, 11 Pet. 175. 184; Norton v. Switzer, 93 U. S. 355, 365. Such was the maritime law of England (The Favourite, 2 C. Rob. Adm. 232; Smith v. Plummer, 1 Barn. & Ald. 575; Wilkins v. Carmichael, 1 Doug.

101; Hussey v. Christie, 9 East, 426) until the lien was conferred by St. 17 & 18 Vict. c. 104, § 191. The rule was founded in a supposed public policy. The master is charged with the safety of ship and cargo, and with the health and life of passengers and crew. The exercise of skill, prudence, and judgment is required of him in all matters affecting the interest of the owners, passengers, and crew. He is invested with powers almost despotic, necessarily conferred upon him by virtue of the necessity imposed by his situation. He has implied authority, arising from his appointment, subject to restrictions and limitations imposed by the law, to contract with regard to the employment of the ship; to contract for repairs and necessaries; to pledge the owner's credit; to hypothecate ship, freight, or cargo; to sell the ship or cargo; and is vested with authority to jettison the cargo. It is his duty to devote his full time and attention to the interest of the owner. The law permits no custom, practice, or contract which would give him an interest against his duty. The power conferred upon him is so great, and its abuse would entail such momentous consequences, that the law has wisely insisted that he should have no personal right, with respect to ship or cargo, that might lead to violation of duty, or tempt him to subordinate the interest of the owners to his own. It is said that the rule should not be enforced here, because the Nebraska was furnished by the owners with a purser, who was the financial officer of the ship, having custody of the freight money formerly intrusted to the master, and which it is said was a sufficient protection to him for the payment of his wages; and that, as the reason of the rule had in this instance ceased, the rule should not be applied. We are unable to concur in that contention. The reason of the rule was never rested upon so slight a foundation. It was founded in a wise public policy, and in view of the large powers conferred by the law upon the master. It was not placed upon any supposed right of the master to withhold his wages from funds in hand. Formerly the supercargo was the financial officer of the ship, not the master. It was never supposed that this fact entitled the master to a lien on the ship. Pursers now frequently administer the finances of the vessel. The master does not, therefore, as suggested, become a mere pilot or navigator. His vast powers remain as before, upon the Great Lakes as upon the high seas, although the occasion for their exercise may be less frequent. If it has become desirable that masters of vessels should have a lien upon the ship for their services, it must come about, as has happened in England, by legislative action, and not through the courts.

2. A salvor is well defined by Lord Stowell in The Neptune, 1 Hagg. Adm. 227, 236, to be a person who, without any particular relation to the ship in distress, proffers useful service, and gives it as a volunteer adventurer, without any pre-existing covenant to connect him with the duty of engaging in the preservation of the vessel. The crew of a ship cannot be salvors unless there has been such abandonment of the vessel by order of the master as to terminate the contract. The Florence, 16 Jur. 572; Mason v. Le Blaireau, 2

Cranch, 240, 270. Nor can a passenger, unless "for extraordinary services, and the use of extraordinary means, not furnished by the equipment of the vessel itself, by which she is saved from imminent danger." The Connemara, 108 U. S. 352, 358, 2 Sup. Ct. 754; The Great Eastern, 11 Law T. (N. S.) 516. A salvor's title is incompatible with the existence of legal duty. We perceive no fact in the case in hand persuasive to entitle the appellant to reward for salvage service. However meritorious the service, it was rendered in discharge of a legal duty. There had occurred no abandonment of the ship "sine spe revertendi aut recuperandi," working annulment of his contract. Such abandonment, according to the law of salvage, must be in consequence of damage received and the state of the elements. Here the vessel was under arrest. Her detention might be of short or long duration, contingent upon being bonded by the owner, upon dismissal of the libel, upon satisfaction of the claim. The master remained on board in pursuance of his duty as master. There had been no dissolution of his contract by the act of parties or by operation of law. His duty thereunder continued and existed at the time of the rendering of the alleged salvage service. That service was in the line of his duty, and upon no principle can be comprehended within the law of salvage. The decree appealed from will be affirmed.