## COLLINS et al. v. THE CARMEN (MINERS' & MERCHANTS' BANK, INTERVENER.)

(First Division. Ketchikan. August 30, 1921.)

No. 477–KA.

**1. Shipping ⊕⇒69—Maritime Liens—Admiralty.**

The captain of a vessel, whether it be an ocean liner or a gas boat, has no right of lien for wages as such. Where one is both captain and pilot on a vessel, query, has he a maritime lien for so much of his wages as are due for service as pilot, if that sum can be segregated from the amount due for service as captain?

**2. Seamen ⊕⇒27—Maritime Liens—Admiralty.**

The captain of a vessel filed a libel against the vessel "for himself and in behalf" of a member of the crew, to secure a lien on the vessel for .wages for both. *Held*, the captain had no right of lien, and as to him the libel was dismissed. As to the member of the crew, the court cannot see "any practical difficulty" in allowing the libel to proceed at the instance of the master for the mariner, especially as the mariner appeared as a witness at the trial and will certainly be bound by the judgment. Libel sustained as to the mariner.

This is a libel against the gas power boat Carmen for wages alleged to be due to L. J. Collins and Leslie McClellan. Collins purports to sue "for himself and in behalf of Leslie Mc-Clellan." The libel alleges that the Union Bay Fisheries Company is the owner of the Carmen, her tackle, apparel, and furniture, and that Collins did, at the behest and special instance of said "Union Bay Fisheries Company and ·N. M. Tate, superintendent, hire aboard said vessel as operator and mariner, and did serve as such operator and mariner aboard said gas power boat from September 27, 1920, to January 8, 1921, at an agreed wage of $150 per month." The libel further alleges "that Leslie McClellan, at the instance of said N. M. Tate, as superintendent of said Union Bay Fisheries company, did go aboard said vessel and perform services thereon as mariner from September 27, 1920, to November 3, 1920, at an agreed wage of $125 per month."

The Miners' & Merchants' Bank of Ketchikan intervened in the proceedings, alleging that it was the owner of a mortgage on said boat and was in possession of said boat as mortgagee.

⊕⇒See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

It denied generally the allegations of the libel, and set forth as an affirmative defense that the said Collins was at all the times mentioned in the complaint the master of said vessel, and that, being such master, he could have no lien thereon for his wages, and also that, as he himself had no lien on said vessel, it was not allowable for him to bring suit on behalf of the said Leslie McClellan.

Charles H. Cosgrove, of Ketchikan, for libelants.
Shoup & Shoup, of Ketchikan, for respondent.

JENNINGS, District Judge. Taking up these points seriatim, it is to be observed:

It appears from the official documents of the respondent vessel, the Carmen, which were exhibited to the court, that she is a registered vessel of 35.91 gross tonnage; 28 net tonnage; length, 49.4; breadth, 16.1; depth, 7.3; and that said documents call for a crew of four men. The deputy collector of customs at Ketchikan testified that under the customs laws a vessel of this character cannot operate without a master, who must take the required oath and be indorsed upon the certificate of registry as master. On September 26, 1920, libelant Collins took the oath as master of said vessel, and his name was then indorsed on said certificate of registry by the deputy collector of customs, and said Collins continued to be master until some time in the month of May, 1921, when E. J. Williams took the oath in the customshouse as master, having his name indorsed on said certificate in place of said Collins. The Carmen, being documented as a registered vessel, is entitled to engage in foreign trade. Under the law the Carmen is subject to a penalty if she is navigated without being in charge of a navigator, whose name must be indorsed on the register of said vessel by the collector of customs or his deputy.

It is contended by respondent that in this country it is the law of the admiralty that the master has no lien upon the vessel for his services. Authorities sustaining this contention could be cited ad libitum, but that is unnecessary, as there is no contention that the law is otherwise. The difficulty of this case arises from a consideration of the question as to whether or not a rule of the admiralty law which originated hundreds of years before gas boats, cannery tenders, and the like were ever thought of, and which was necessitated by the conditions

of shipping at the time such rule came into existence, applies, or should apply, to the nominal commander of a small gas boat plying in local waters under the direct supervision and management of the owners themselves.

In this case Collins, although termed master, had no authority to employ or discharge help; no authority to bind the vessel for supplies or materials furnished to it; no authority or power to say where the vessel should go. At the time the rule came into existence, and as the reason therefor, the master of ocean-going vessels had charge of the cargo, sold it in foreign ports, received the money therefor, had authority to pay himself his wages out of the moneys that would be received by him from time to time from the sale of the cargo, had power to hire and discharge his crew, and, even if necessary, to give a bottomry bond on the vessel itself, and generally to act as agent of the owner; but the case at bar presents an entirely different state of affairs. Here is a small cannery tender, always under the watchful eye of the owners themselves. It never carries a cargo to sell; the master has no way to pay his wages out of the earnings of the boat because the boat has no cash transactions; he has no authority, except perhaps in case of great emergency, to purchase supplies for the boat; takes the boat on no long voyages, but plies mostly between the cannery and the fish traps or other sources of fish supply. To apply to him a rule originating under different circumstances and designed for captains of deep sea vessels is, it seems to me, not always just; but, while this is so, yet I am clearly of the opinion that the changed conditions call for action by the legislative and not by the judicial power.

In the case of The Nebraska, 75 Fed. 598, 21 C. C. A. 448, Judge Jenkins of the Circuit Court of Appeals for the Seventh Circuit overruled the contention there made that, as the vessel there concerned carried a purser who conducted the financial transactions and handled the cash, the rule should not apply on account of the fact that the reason on which it was based was nonexistent. That learned jurist said:

"The rule was founded in a supposed public policy. The master is charged with the safety of ship and cargo, and with the health and life of passengers and crew. The exercise of skill, prudence, and judgment is required of him in all matters affecting the interest of the owners, passengers, and crew. He is invested with

powers almost despotic, necessarily conferred upon him by virtue of the necessity imposed by his situation. He has implied authority, arising from his appointment, subject to restrictions and limitations imposed by the law, to contract with regard to the employment of the ship; to contract for repairs and necessaries; to pledge the owner's credit; to hypothecate ship, freight, or cargo; to sell the ship or cargo; and is vested with authority to jettison the cargo. It is his duty to devote his full time and attention to the interest of the owner. The law permits no custom, practice, or contract which would give him an interest against his duty. The power conferred upon him is so great, and its abuse would entail such momentous consequences, that the law has wisely insisted that he should have no personal right, with respect to ship or cargo, that might lead to violation of duty, or tempt him to subordinate the interest of the owners to his own. It is said that the rule should not be enforced here, because the Nebraska was furnished by the owners with a purser, who was the financial officer of the ship, having custody of the freight money formerly intrusted to the master, and which it is said was a sufficient protection to him for the payment of his wages; and, that, as the reason of the rule had in this instance ceased, the rule should not be applied. We are unable to concur in that contention. The reason of the rule was never rested upon so slight a foundation. It was founded in a wise public policy, and in view of the large powers conferred by the law upon the master. It was not placed upon any supposed right of the master to withhold his wages from funds in hand. Formerly the supercargo was the financial officer of the ship, not the master. It was never supposed that this fact entitled the master to a lien on the ship. Pursers now frequently administer the finances of the vessel. The master does not, therefore, as suggested, become a mere pilot or navigator. His vast powers remain as before, upon the Great Lakes as upon the high seas, although the occasion for their exercise may be less frequent. If it has become desirable that masters of vessels should have a lien upon the ship for their services, it must come about, as has happened in England, by legislative action, and not through the courts."

The United States District Court, in the case of The Willamette Valley, 76 Fed. 847, declined to sustain a claim of lien alleged to have inured for services as master and pilot because the value of the services performed in each of such capacities could not be, or was not, segregated, saying:

"If this court should now declare, for the first time, that masters, who are also licensed pilots for places to and from which they travel, and who as such, incidentally and in connection with their primary duties as master, perform pilotage services to their own vessels, are thereby entitled to a lien for their whole wages as masters upon the theory that they are pilots of the vessels they command, this would be to establish a precedent which, if fol-

lowed, would do away with the heretofore strict rule to the contrary. It would amount, practically, to judicial legislation in favor of the master's lien. It may be that, if the services rendered as master and as pilot can be satisfactorily segregated, the master would be entitled to a lien for the services he renders his vessel distinctively as pilot. In this case no such segregation has been proved."

That decision would seem to be controlling in this case, for no segregation has been made, and perhaps none could be made, of the amount earned as master from that earned in the performance of other duties connected with said vessel, the Carmen.

I am also of the opinion that the fact that Collins was duly registered in the customshouse as master of said vessel is of controlling force, and that, being so, registered and having taken the oath as master, he must be held to be master for all legal intendments and purposes.

The case of The Dubuque, Fed. Cas. No. 4,110, 7 Fed. Cas. 1141, was that of a libel in rem for the wages of libelant as pilot and sailing master of the propeller Dubuque. The evidence therein showed that the libelant was de facto, master, but was not the registered master, of the vessel. The point was raised that, as the libelant was actually master of the vessel, he could not have a lien for his wages, and that the fact that Moir was the registered master of said vessel was of no consequence in view of the fact that the libelant himself performed all the duties of master; but the learned District Judge said:

"In the absence of the registry laws, or in a case in which the registry laws have not been resorted to, there can be no doubt he would. be master to whom the owner actually intrusted the navigation and discipline of the vessel. But how is it when, as in this case, the registry laws have been resorted to?"

The court then goes on to elaborate upon the object of the registry laws and the importance of a compliance therewith, and adds this:

"In view of the importance thus attached by the law to the office of master, the registry certainly ought not to be treated lightly, as evidence of who is master. I think far the safer and more satisfactory rule is to hold that, in case of resort to the registry laws, all the incidents of those laws attach, and that the relations required by the law to exist between the owner and the master, and between the master and the vessel, and between the master and the crew become fixed by the registry, and any other arrangements

the owner may make for the actual discharge of the duties of master are entirely subject to the relations so fixed, until they are changed in the manner prescribed by the registry laws, and that, so long as the person in whose name, as master, the vessel is registered, continues to be master by the registry, he is such to all intents and purposes in the eye of the law. * * *

"Any other position opens the door wide to frauds upon the law, and at once renders the law of no force or effect whatever. If one person may be entered as master for the purpose of registry, and another be master in fact, whether a citizen or not, and without having executed the required bond, then the law may be violated with impunity, and the sooner it is taken from the statute book the better. * * *

"I hold, therefore, that the person in whose name the vessel is registered as master is master for every legal intendment and purpose; that, where there is a master de jure by virtue of the registry, there can be no master de facto in legal contemplation; that the law recognizes in this respect but one supreme authority, and therefore, if another person than the registered master is employed by the owners to navigate and even discipline the vessel, he does not thereby become master either de facto or de jure; that the relations between master and crew, as they exist by the maritime law and the acts of Congress, become fixed by the registry, and cannot be changed by any such interference."

I am constrained, therefore—much against my will, for I realize that different conditions require different remedies—to hold that Collins has no lien for the value of the services performed as master, and that, as the value of such services has not been segregated from the value of general services performed by him, he has no lien at all.

As to McClellan, however, the case is different. I think that he clearly has a lien for his wages. I do not think that the point that, as Collins had no lien, he cannot sue in behalf of McClellan, is well taken.

In the case of The Blackwall, 77 U. S. (10 Wall.) 1, 19 L. Ed. 870, a libel for salvage was filed in the name of the master, although the master made no claim in his own behalf, but, on the other hand, expressly disclaimed. The Supreme Court said:

"Salvage suits are frequently promoted by the master alone, in behalf of himself and the owners and crew, or in behalf of the owners and crew, or the owners alone, without making any claim in his own behalf, and the practice has never led to any practical difficulty, as the whole subject, in case of controversy, is within the control of the court."

In this case the res is before the court, and I cannot see "any practical difficulty" in allowing the libel to proceed at the instance of the master for the mariner, especially as the mariner appeared as a witness at the trial and will certainly be bound by the judgment.

The libel will be dismissed as to Collins, and sustained as to McClellan for the amount claimed in the libel to be due him.

⬦See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes